**Patrick V. MORRIS, Individually and on Behalf of All Others Similarly Situated, Plaintiff,**

v.

**WACHOVIA SECURITIES, INC., Defendant.**

**No. CIV. 3:02CV797.**

United States District Court, E.D. Virginia, Richmond Division.

Aug. 12, 2003.

624

Mark J. Krudy, Esquire, The Ironfronts, Richmond, Steven G. Schulman, Esquire, Peter Safirstein, Esquire, Daniel R. Altman, Esquire, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, for Plaintiff.

James A. Murphy, Esquire, Harris L. Kay, Esquire, Cameron S. Matheson, LeClair Ryan, Richmond, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

In this civil action, the Plaintiff, Patrick V. Morris, seeks to recover compensatory and/or rescissionary damages, prejudgment interest, disgorgement of profits, and costs and attorneys' fees from the Defendant, Wachovia Securities, Inc. ("Wacho-

via"), for alleged violations of § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) (the "1934 Act") and § 206 of the Investment Advisers Act of 1940 (15 U.S.C. § 80b–6) (the "IAA") in connection with Wachovia's Masters Program, a portfolio management service to which Morris subscribed. Morris also purports to represent a class of all similarly situated individuals and seeks similar recovery for this class.

Since initiating this action on November 1, 2002, Morris has twice amended the Complaint, once as a matter of right under Fed.R.Civ.P. 15(a), and once after the Court granted Wachovia's motion to dismiss. However, dismissal upon Wachovia's motion was without prejudice because it was determined that Morris had alleged facts that plausibly could support a claim under the federal securities laws. Thus, Morris was afforded a second opportunity to amend his Complaint, albeit with the strict admonition that leave for any further amendment would not be forthcoming. Morris then filed the Second Amended Complaint ("SAC"), and Wachovia now has moved to dismiss it under Fed.R.Civ.P. 12(b)(6), and Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4 ("PSLRA"). For the reasons that follow, Wachovia's motion is granted in part and denied in part.

## STATEMENT OF FACTS

The SAC is eighty-five pages long and is articulated in considerable detail. As is appropriate, the facts are stated as asserted in the SAC (including its twenty-six exhibits), affording Morris all reasonable inferences.

### A. The Masters Program

In December 2001, Morris enrolled in a portfolio management program offered by Wachovia known as the "Masters Program." As advertised, the Masters Pro-

gram offers investors with assets of $100,000 or more the ability to receive the services of Portfolio Managers who usually only work with accounts of $1 million or more. (SAC Ex. 3). For a single annual fee, Wachovia takes custody of the investors' assets, while the Portfolio Managers make the decisions respecting the securities to be purchased for the investor's account. Wachovia's marketing literature describes the Masters Program as involving a three-step process.

Under Step 1, a Wachovia representative analyzes the individual investor's investment needs and then determines how the investor's assets should be allocated. Based on this analysis, Wachovia's representative assists the investor to develop an investment policy statement used by Wachovia in monitoring the investor's account. (*Id.*)

Under Step 2, Wachovia recommends a Portfolio Manager or Managers "whose style, philosophy, and performance record best suit [the investor's] investment strategy." (*Id.*) The literature then explains the criteria that Wachovia considers in deciding whether to recommend a Portfolio Manager:

> Our rigorous due-diligence process, carefully screens candidates. This screening process includes
> - reviewing credentials
> - determining their investment style
> - examining each manager's performance record
> - tracking the consistency of the returns in varying market conditions
> - evaluating and monitoring the level or risk taken by the manager, measured against the value of the returns generated

(*Id.*) The literature goes on to explain that the Portfolio Manager or Managers chosen by the investor actually select the individual securities to be bought and sold in the investor's account.

In Step 3 of the process Wachovia monitors the activity and performance of the investor's portfolio. Wachovia represents that its representatives will "closely track" the progress of the portfolios, and that the customers will receive comprehensive quarterly reports. (*Id.*) In other words, the marketing literature creates the impression that Wachovia monitors the performance of the Portfolio Managers to ensure quality and to assure investments that conform with each individual investor's needs.

After explaining the three-step process, the Masters Program literature, under the heading "Value Added Service," provides a summary of the services that investors can expect to receive:

> In [Wachovia's] Masters Program, you work with a carefully assembled team of experts. These professionals add value through their systematic investment discipline, financial expertise, and personal attention to your objectives. *Your annual fee covers the comprehensive services vital to successfully managing a significant investment portfolio:*
>
> ● Identification and analysis of your investment objectives
> ● Access to a select roster of leading investment managers, evaluated on the following:
>> ● quality, stability, and depth of management
>> ● effective, disciplined, and consistent investment process
>> ● consistent long-term investment returns
>> ● solid performance relative to their peer group
> ● Investment-manager search and recommendation

> ● Ongoing portfolio management and consultation with your [Wachovia representative]
> ● Investment manager's fees
> ● *All securities transaction costs*
> ● Custody of securities
> ● Automatic sweep of cash balances into money-market funds
> ● Monthly activity statements
> ● Quarterly portfolio evaluation and market overview
> ● Annual review of your objectives

(*Id.* (emphasis added).)

## B. Morris's Experience And The Present Action

Based in part on the representations made in Wachovia's marketing literature, Morris agreed to enroll in the Masters Program in December 2001. Within several months, Morris saw his initial investment of approximately $ 1.4 million depreciate by $300,000. (SAC ¶ 19). Morris alleges that Wachovia committed securities fraud by misrepresenting and/or failing to disclose certain material facts about the Masters Program, which affected his ability to make an informed decision respecting whether he should participate in the program. These omissions and/or misrepresentations included:

i. That its selection of [Portfolio Managers][1] was not based on factors such as whether the [Portfolio Manager] generated sufficient commissions for Wachovia;

ii. That it failed to adequately monitor the [Portfolio Manager] chosen for the Master [sic] Program;

iii. The misrepresentation of the deleterious effects of "aggregation" upon Plaintiff's account;

---

1. In the SAC, Morris occasionally refers to Portfolio Managers as "Investment Advisers." Elsewhere, these individuals are referred to as "Portfolio Managers." In the interest of clarity, these individuals shall be referred to as "Portfolio Managers" throughout this Memorandum Opinion.

iv. The misrepresentation of its intention to charge Plaintiff's account an "SEC Fee";

v. The overcharging of Plaintiff by inflating the SEC Fee;

vi. The misrepresentation of the price of securities to Plaintiff; and

vii. The failure to provide Plaintiff with a periodic report, not less than quarterly, containing such basic information as the correct transaction price of Plaintiff's securities trades, that Plaintiff's transactions were aggregated with other transactions, that his price was an average price or that average price information was available to Plaintiff.

(SAC ¶ 3). According to Morris, these misrepresentations and omissions give rise to three separate claims: (1) a claim for violations of § 10(b) of the 1934 Act (15 U.S.C. § 78j(b)) and Rule 10b–5 (17 C.F.R. § 240.10b–5) promulgated thereunder; (2) a claim for violations of § 10(b) of the 1934 Act and Rule 10b–10 (17 C.F.R. § 240.10b–10) promulgated thereunder; and (3) a claim pursuant to § 215 of the IAA (15 U.S.C. § 80b–15) for violations of § 206 of the IAA.

The SAC devotes approximately seventy pages to outlining and then providing particulars respecting Wachovia's alleged misrepresentations and omissions. Brevity and clarity of understanding Morris's claims both will be served by referring to several headings in the section of the SAC captioned "SUBSTANTIVE ALLEGATIONS." There, it is alleged that:

● Wachovia never disclosed the material fact that [Portfolio Managers] selected to participate in the Masters Program by Wachovia were selected based on criteria which included whether or not the [Portfolio Manager's] inclusion would be financially beneficial to Wachovia (SAC at 10)

● Contrary to its disclosures, Wachovia Failed to perform due diligence about its [Portfolio Managers] (SAC at 11)

● The deleterious and undisclosed effect of aggregating customers' purchases or sales of securities in the Masters Program (SAC at 13)

● Wachovia failed to properly disclose that it was charging an SEC transaction fee to its Masters Program customers (SAC at 53)

● Wachovia deliberately miscalculated the SEC fee thereby creating a profit center (SAC at 55)

● Wachovia did not send plaintiff a periodic report containing the information stated on plaintiff's trade confirmations (SAC at 73)

The particulars of each of these topic headings are set forth in the paragraphs that follow the headings.

The SAC then proceeds to articulate three claims. The First Claim is under § 10(b) of the 1934 and SEC Rule 10b–5. It charges that Wachovia violated Rule 10b–5 by:

engag[ing] in a deceptive contrivance, scheme, practice, and course of conduct in connection with the purchase and sale of securities, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon Plaintiff and other members of the Class, misrepresented and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and other members of the Class. The purpose and effect of said scheme, practice and course of conduct was to create an illusion that (1) aggregation was only being performed in Plaintiff's account when such aggregation would result in a lower commission or more advantageous

net price; (2) Wachovia was debiting and/or crediting Plaintiff's account the correct and exact amount for securities transactions based upon the value of the underlying trades executed by Wachovia for Plaintiff; (3) Wachovia was not charging Plaintiff any "transaction" fees in excess of the Wrap Fee; (4) Wachovia was properly calculating the SEC Fee; (5) Wachovia, in the account statements, was properly disclosing to Plaintiff the costs and execution prices for his Masters Program trades; and (6) Wachovia was acting, pursuant to its fiduciary duty, in a disinterested capacity when selecting the [Portfolio Managers].

(SAC ¶ 71). In the First Claim, the SAC also alleges that, as a consequence of the several omissions and misrepresentations, he and the other putative class members were: "fraudulently induced to enroll and participate in the Masters Program" (SAC ¶ 76) and were "over-charged for securities purchases and under-credited for securities sales." (SAC ¶ 77)

In the Second Claim, it is alleged that Rule 10b–10 "requires a broker-dealer to disclose to its customers the price of any security purchased or sold for a customer, whether an average price is being utilized and [that] information regarding the underlying transactions forming the average price is available to the investor upon request." (SAC ¶ 82). Morris then claims that "[b]y failing to provide Plaintiff with either a trade confirmation or, since the receipt of confirmations was waived, with a periodic report containing pertinent information otherwise available on a confirmation, Wachovia violated the requirements of Rule 10b–10." (SAC ¶ 84). As a consequence of these violations, Morris alleges he suffered damages in that he "was never informed on the most basic aspect of trades made on his behalf." (SAC ¶ 85).

In the Third Claim, made under the IAA, Morris alleges that the conduct that was charged as a violation of Rule 10b–5 also violated Section 206 of the IAA. (SAC ¶ 89). In that claim, Morris seeks rescission of the contract with Wachovia and the return of all fees paid in connection with the Masters Program.

The SAC makes reference to twenty-six documents, two of which are especially significant in assessing the claims raised in the SAC. First, Morris signed the Trade Confirmation/Proxy Waiver Authorization Form (the "Waiver") (SAC ¶ 58, Deft. Mem. Ex. 9) wherein he waived receipt of trade confirmation slips and delegated proxy voting rights to his Portfolio Managers. As discussed in greater detail below, the Waiver is important because the trade confirmation slips state quite clearly that Wachovia was charging Morris a "SEC Fee" on certain transactions. However, because Morris waived receipt of these confirmations and because his monthly account statements did not disclose that such fees had been charged, Morris was not receiving, as a matter of course, regular disclosures about the imposition of the SEC fees.

The second, and more important agreement is the Masters Investment Consulting Program Account Agreement (the "Agreement"), a document which appears to be the standard form agreement that Wachovia enters into with each of its Masters Program clients. (SAC Ex. 1). Three aspects of the Agreement itself are particularly relevant to Morris's claims against Wachovia. First, in Exhibit A to the Agreement, Morris specified the Portfolio Managers that he wanted to manage his account and the amount of his initial assets that each manager was to manage.[2]

---

**2.** The five managers selected and the initial assets assigned to each are as follows: TCW

Investment Management Co. ($400,000); NWQ Investment Management Co. ($600,-

Morris's designation of Portfolio Managers is important, because, in the Agreement, Morris acknowledges receipt of separate disclosure documents from each of the Portfolio Managers that he selected, (Deft. Mem.Ex. 1–5), in addition to the Wachovia Disclosure Document (SAC Ex. 2), wherein Wachovia made numerous disclosures respecting the Masters Program. Finally, the document itself contains numerous disclosures. Of particular relevance to Morris's claims is the disclosure under the heading "FEE SCHEDULE," where Wachovia states that "[t]he [Masters Program] has a wrap fee schedule (*i.e.*, there are no separate charges for execution services or Masters Manager service). *See disclosure document for details of fee exclusions, calculation and refunds.*" (SAC Ex. 1 (emphasis added)). When considered together, these aspects of the Agreement constitute a large portion of the universe of material information available to Morris at the time he enrolled in the program, and include not only the disclosures in the Agreement itself, but also the disclosures in the Disclosure Document, and the disclosures by each of the Portfolio Managers that Morris selected.

## DISCUSSION

To survive a motion to dismiss, a complaint in a securities fraud action must satisfy two rather stringent requirements. First, to state a claim upon which relief can be granted, within the meaning of Fed.R.Civ.P. 12(b)(6), a securities fraud claim, because it involves allegations of fraud, must satisfy the requirements of Fed.R.Civ.P. 9(b), and, as to such claims, state with particularity the circumstances constituting fraud. Also, since 1995, a securities fraud claim must satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act,

*see* 15 U.S.C. § 78u–4. Those constraints frame the analysis of Wachovia's motion to dismiss the First and Second Claims. However, the PSLRA is not applicable to the Third Claim which is pressed under the IAA.

■ Under Rule 12(b)(6), the party seeking dismissal must establish that the plaintiff cannot prove any set of facts that will support his claim and entitle him to relief. In considering a motion under 12(b)(6), the Court accepts as true the factual allegations in the Complaint and draws all reasonable inferences from those facts in the light most favorable to the plaintiff. *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir.1997). In all cases, the court will consider the facts stated in the complaint, the documents attached thereto, and any relevant matters of public record. *See* 2 James Wm. Moore, et al., Moore's Federal Practice § 12.34[2] (3d ed.2002) (collecting cases and citing *Norfolk Southern Ry. Co. v. Shulimson Bros.,* 1 F.Supp.2d 553, 555 n. 1 (W.D.N.C.1998)). In securities fraud actions, courts will also examine "the other information that was publicly available to reasonable investors at the time the defendant made statements the plaintiff[ ] alleged were fraudulent, including documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which the plaintiff's allegations necessarily rely." *In re The First Union Corp. Securities Litigation,* 128 F.Supp.2d 871, 883 (W.D.N.C.2001). As the Fourth Circuit has explained, examination of the information available to the plaintiff is undertaken "because 'even lies are not actionable when an investor possesses information sufficient to call the [mis]representation into question.'" *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 617 (4th Cir.1999).

000); Davis Selected Advisers ($100,000); Roxbury Capital Management ($200,000);

and Brandes Investment Partners ($100,000). (SAC Ex. 1).

With these precepts in mind, each aspect of the three claims that Morris raises in the SAC will be measured against the Rule 12(b)(6) standard.

## A. The Section 10(b) Claims

In the First and Second Claims, Morris alleges violations of § 10(b) of the 1934 Act, which prohibits fraudulent conduct "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). Section 10(b) makes it unlawful for any person

[t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Thus, in order to state a claim under § 10(b), a plaintiff must allege that, "in connection with the purchase or sale of a security, '(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages.'" *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir.1999) (footnote omitted) (quoting *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1261 (4th Cir.1993)).

■ Here, Morris specifically alleges violations of Rule 10b–5 (17 C.F.R. § 240.10b–5),[3] and Rule 10b–10 (17 C.F.R. § 240.10b–10),[4] both promulgated by the SEC under § 10(b). Although these rules proscribe specific types of conduct and impose specific requirements, § 10(b) itself is the source of any private right of action, and consequently, any claim based on a violation of a rule promulgated thereunder must state a violation of § 10(b). *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 174–76, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *Arst v. Stifel, Nicolaus & Co.*, 86 F.3d 973, 977 (10th Cir.1996). Stated differently, a private plaintiff may not bring an action under Rules 10b–5 or 10b–10 for acts not prohibited by § 10(b). Therefore, Morris must demonstrate that each of the misrepresentations or omissions identified in the SAC constitute, individually or collectively, a violation of § 10(b) in order to state a claim as to that misrepresentation or omission, or as to them collectively. Hence, it is necessary to analyze each of the alleged misrepresentations and omissions separately to determine whether Morris has stated a claim under § 10(b) as to that misrepresentation or omission. In order to simplify the process, Morris's claims are divided into four categories:

(1) The claims involving Wachovia's selection and monitoring of Portfolio Managers (SAC ¶¶ 3.i. and 3.ii.; SAC at 10–11 *et seq.*);

(2) The claims involving the aggregation of trades (SAC ¶¶ 3.iii. and 3.vi.; SAC at 13 *et seq.*);

---

**3.** Rule 10b–5 states that it shall be unlawful for any person, "in connection with the purchase or sale of any security[,]"

 (a) To employ any device, scheme, or artifice to defraud,

 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

**4.** Rule 10b–10 generally requires brokers and dealers of securities to disclose certain information its customers at or before the completion of any transaction for the purchase or sale of securities.

(3) The claims involving the pass-along and rounding-up of SEC fees (SAC ¶¶ 3.iv. and 3.v.; SAC at 53–55, *et seq.*); and

(4) The claim that Wachovia misrepresented the price of securities and did not provide a periodic report to Morris with the required information (SAC ¶¶ 3.vi. and 3.vii.; SAC at 73 *et seq.*).

Each category will be analyzed in turn.

### 1. The Selection And Monitoring Of Portfolio Managers

■ Morris alleges that, contrary to its representation that "[o]nly those managers who meet our high standards are included in the Masters Program," (SAC Ex. 3), Wachovia actually "considered, as a determinative factor for admission, whether the Portfolio Manager's inclusion in the Masters Program would be financially beneficial to Wachovia." (SAC ¶ 27). Specifically, Morris claims that Wachovia "considered as critical factors for admittance: (1) whether the prospective Portfolio Manager would send additional trading or custodial revenue to Wachovia in return for admittance into the Masters Program; and (2) whether the prospective [Portfolio Manager]'s participation in the Masters Program would facilitate and increase the profitability of Wachovia's broker-recruiting efforts." (SAC ¶ 28).

Morris also alleges that Wachovia did not monitor the performance of the Portfolio Managers as it claimed it would. (SAC ¶¶ 30–31). Specifically, Morris claims that Wachovia neglected to review the investment strategy of its Portfolio Managers to ensure that the managers adhered to the strategy that they advertised to program participants during the selection process. (SAC ¶¶ 33–34). And, Morris alleges that Wachovia did not monitor the results that the various Portfolio Managers obtained, as it claimed it would, and even prevented the Wachovia representatives of Wachovia clients from contacting Portfolio Managers to conduct their own due diligence. (SAC ¶ 34).

Morris claims that, by failing to inform him of non-merit-based criteria for manager selection and by misrepresenting that it would monitor managers after selection, Wachovia caused him to suffer "damages by denying [him][the] right to accurately and completely assess the merits, costs and benefits of investing in the Masters Program." (SAC ¶ 78). Had he known the truth about manager selection and monitoring, Morris claims, he never would have enrolled in the program. (*Id.*) However, the SAC does not describe with any particularity how Wachovia's selection and monitoring practices caused Morris any quantifiable economic harm. Nor does the SAC claim that any of the Portfolio Managers pursued strategies different from those which they advertised, or that his Portfolio Managers were unsatisfactory in any way.

Nor does the SAC attempt to differentiate damages attributable to these alleged frauds from the damages attributable to Wachovia's other allegedly fraudulent acts. For example, the SAC articulates precisely the loss attributable to aggregation (SAC ¶ 46), the loss attributable to the imposition of SEC fees (SAC ¶ 52), and the loss attributable to the alleged miscalculation of the SEC fee on certain transactions (SAC ¶ 57). The SAC does not articulate any loss thought to be attributable to Wachovia's practice of selecting and monitoring Portfolio Managers.

The closest that the SAC comes to doing that is the contention that, as a result of Wachovia's practices, Morris is "entitled to rescind ... his agreement with Wachovia and *should be placed in the same position that he had been before he entered the Masters Program.*" (SAC ¶ 78 (emphasis added)). Thus, it appears that Morris seeks as damages—the diminution in value

of his portfolio. However, Morris has not alleged that the diminution in value of his portfolio is attributable in any way to the conduct of his Portfolio Managers.

■ In order to state a claim under § 10(b) and to satisfy the PSLRA, a plaintiff raising a § 10(b) claim must allege that the omission or misrepresentation giving rise to the claim is the proximate cause of some loss on the part of the plaintiffs. 15 U.S.C. § 78u–4(b)(4); *Gasner v. Board of Supervisors,* 103 F.3d 351, 360 (4th Cir. 1996); *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001); *Arnlund v. Smith,* 210 F.Supp.2d 755, 768 (E.D.Va.2002). The Fourth Circuit has explained that this causation element consists of two components, each of which the § 10(b) plaintiff must prove in order to prevail. *Gasner,* 103 F.3d at 360. First, the § 10(b) plaintiff must show loss causation—*i.e.,* that the alleged fraudulent statement or omission was the cause of the actual loss suffered. *Id.* Second, the § 10(b) plaintiff must show transaction causation—*i.e.,* that the alleged fraudulent statement or omission caused the plaintiff to engage in the transaction in question. *Id.* As explained by the Second Circuit in *Suez Equity Investors:*

> It is settled that causation under federal securities laws is two-pronged: a plaintiff must allege both transaction causation, *i.e.,* that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transac-

tion; and loss causation, *i.e.,* that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.

250 F.3d at 95. Thus "[a] direct or proximate relationship between the loss and the misrepresentation must be shown." *Gasner,* 103 F.3d at 360.[5]

By failing to identify any economic harm attributable to Wachovia's alleged misrepresentations and omissions respecting the selection and monitoring of Portfolio Managers, Morris has failed to satisfy the loss causation component of the causation element of a securities fraud claim under § 10(b). In Paragraph 78 of the SAC, Morris does allege that, but for the misrepresentations respecting the selection and monitoring of the Portfolio Managers, he would not have entered into the Masters Program, thus sufficiently pleading transaction causation. But, notably absent is any allegation of deficient performance by any of Morris's Portfolio Managers. Although Morris lost approximately 20% of the value of the initial investment that he committed to management under the Masters Program, there is no allegation that this was the result of substandard investment decisions. In fact, this performance mirrors that of the Dow Jones Industrial Average ("DJIA"), and is markedly better than that of the Standard & Poor's 500 ("S & P 500") and the NASDAQ Composite Index ("NASDAQ"), over the same period.[6] Having failed to allege that the mis-

**5.** In his briefs and at oral argument, Morris argued that the Second Circuit's decision in *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167 (2d Cir.1970) is authority for the proposition that a lesser showing of causation is permissible in stating a securities fraud claim where a plaintiff seeks rescission damages. Assuming that Morris's interpretation of *Chasins* is correct and that this aspect of *Chasins* survived both adoption of the PSLRA and the Second Circuit's recent decision in *Suez Equity Investors,* both of which require loss causation to be pleaded without regard to the reme-

dy sought, the Eleventh Circuit's decision in *Rousseff v. E.F. Hutton Co.,* 843 F.2d 1326, 1329 (11th Cir.1988) directly refutes Morris's contention: "The district court's finding that rescission was the appropriate remedy in this case does not eliminate the requirement that the plaintiff establish that his loss was proximately caused by the defendant's misconduct."

**6.** The DJIA declined from 9984 on December 12, 2001 to 7784 on July 22, 2002, a drop of approximately 21%; the S & P 500 declined

representations respecting the selection and monitoring of Portfolio Managers caused him to sustain a loss, Morris has not pleaded loss causation.

In cases where courts have considered claims similar to those presented here, the conclusion has been the same. *See e.g., French v. First Union Securities, Inc.,* 209 F.Supp.2d 818 (M.D.Tenn.2002); *Laub v. Faessel,* 981 F.Supp. 870 (S.D.N.Y.1997). In *Laub,* another district court reached the identical conclusion respecting a § 10(b) claim quite similar to Morris's claims respecting the selection and monitoring of Portfolio Managers. *See* 981 F.Supp. 870. There, the plaintiff alleged that the defendant represented to the plaintiff that he was a registered investment advisor, when in fact his only formal training was as a dentist. The court dismissed the action, finding no allegation of loss causation:

> Laub has not made any allegation that Faessel's misrepresentation caused the loss incurred under any specific stock in Laub's portfolio. He merely alleges that, due to Faessel's deceit, he paid Faessel for fraudulent services from which he may have been induced to purchase as he did. The complaint makes no claim, however, that the asserted losses flow directly and foreseeably from Faessel's misrepresentations, but rather, it appears, from the market forces to which all investors are subject.

981 F.Supp. at 872.

Wachovia's alleged misrepresentation and omission respecting the selection and monitoring of the Portfolio Manager presents a scenario similar to that presented in *Laub.* Morris has identified a series of material omissions and representations respecting the selecting and monitoring of Portfolio Managers, and, for purposes of this motion, they must be assumed to be true. However, Morris has not alleged any loss resulting from those misrepresentations and omissions.[7] Because this defect is fatal to Morris's claims respecting the selection and monitoring of Portfolio Managers, it is unnecessary to address whether Morris has satisfied the other elements of § 10(b) as to those claims.

## 2. The Aggregation Of Trades

 Respecting the aggregation of trades, Morris contends that Wachovia, contrary to its disclosure in the Disclosure Document, aggregated Morris's trades with those of other investors in numerous instances where aggregation worked to Morris's detriment. The process of aggregation is a rather simple, and apparently

---

from 1137 to 820, a drop of approximately 28%; and the NASDAQ dropped from 2011 to 1283, a drop of approximately 36%.

7. Notwithstanding the failure of the SAC to allege any causal connection between the performance of the Portfolio Managers and the diminution in the value of Morris's portfolio, the SAC perhaps can be read to state a claim for recovery of damages for the unquantified harm that Morris suffered by being deprived of the ability to make an informed decision, wholly apart from the diminution in value of his portfolio. But, to allow recovery under such a theory would subvert the pleading requirement of loss causation. This is so because any harm caused by deprivation of information during the decision-making process is subsumed in the transaction causation inquiry. Stated differently, any harm that Morris suffered by being deprived of the ability to make an informed decision is subsumed in the question of whether he would have entered into the transaction but for Wachovia's misrepresentation. To allow a securities fraud plaintiff to satisfy the two-pronged causation element by alleging that he would not have entered into the transaction in question but for the alleged misrepresentation (thus satisfying the transaction causation component) and then by showing that the alleged misrepresentations caused a "loss" in that the plaintiff was deprived of all material information to decide whether to enter the transaction (and, in that fashion, satisfying the loss causation component) would effectively render the two-pronged inquiry a tautology.

commonplace, practice: when a portfolio manager manages funds for numerous accounts, and wants to purchase or sell a particular stock for those accounts, rather than execute the purchase separately for each individual account, the manager will execute a small number of block orders of the stock, and then will charge each individual investor's account the average price that he was able to obtain for the stock.

In the Disclosure Document, Wachovia explained the conditions under which it would aggregate trades:

> It is our practice, when feasible, to aggregate for execution as a single transaction orders for the purchase or sale of a particular security for the accounts of several Masters, PIM and/or Compass Advisory clients, *in order to seek a lower commission or more advantageous net price.*

(SAC Ex. 2 at 4 (emphasis added)). Because the Masters Program did not involve commissions, Morris argues, the only factor that, consistent with Wachovia's representation, could trigger aggregation would be the achievement of a "more advantageous net price" for Morris. But, Morris argues, the practice of aggregation always worked to his detriment:

> Aggregation always resulted in a worse price for [Morris] because the more shares of a security that are sought for purchase, the higher the price of the stock. Conversely, the more shares of a security that are offered for sale, the lower the price of the stock. As each order is aggregated, the price for which those shares become available goes up on a purchase transaction and down on a sale transaction.

(SAC ¶ 40). Morris then identifies every single instance—over 600 total occasions—where the trades for Morris's accounts were aggregated, (SAC ¶ 45), and explains how damages relating to aggregation can be calculated:

> Plaintiff's damages, relating to aggregation, is [sic] the difference between the aggregated price and the prevailing price for the number of shares Plaintiff was either purchasing or selling in the transaction. For instance, on 2/4/2002 Wachovia purchased 172 shares of Computer Associates for Plaintiff's Account. Had Plaintiff purchased those shares at the prevailing market price at the time his order was entered he would have purchased the shares at $32.28. *See* [SAC] Exhibit 7. Instead, Wachovia transferred the shares into Morris [sic] account at $32.494285714/share. In this instance, aggregation cost Morris $0.1142857/share or $19.6571421. Damages can be accurately calculated based upon time and sales information that is within the control of Wachovia.

(SAC ¶ 46).

Wachovia argues that this allegation is false because Wachovia was not the party that aggregated trades. Rather, says Wachovia, the documents attached to the SAC demonstrate that the Portfolio Managers were the parties that aggregated trades. (*See* SAC Exs. 5, 7–21). And, says Wachovia, each of Morris's Portfolio Managers disclosed to Morris that it would aggregate trades, without regard to whether doing so resulted in price advantage for the investor. Thus, according to Wachovia, the fact that aggregation occurred was fully disclosed to Morris.

The documents attached to the SAC indicate that the Portfolio Managers were the parties who aggregated trades, and that the Portfolio Managers fully disclosed that they would engage in this practice. The following chart contains the disclosure made by each of Morris's Portfolio Managers:

| Masters Portfolio Manager | Aggregation Disclosure |
|---|---|
| TCW Investment Management Co. | "In connection with certain purchase or sale programs, and in other circumstances if practicable, if multiple trades for a specific security are made with the same broker in a single day, those securities are allocated to accounts based on a weighted average purchase or sale price." (Wachovia Mem. Ex. 4 at 22). |
| NWQ Investment Management Co. | "NWQ may purchase or sell the same security for many accounts at the same time. When possible, NWQ will aggregate the same transactions in the same securities for many accounts that have the same brokerage firm as custodian … If NWQ has to place more than one order in any one day at a single brokerage firm to fill an aggregated transaction, each account participating in such an aggregated transaction will receive the average price paid in all orders for that specific aggregated transaction on that day." (Wachovia Mem. Ex. 2 at 14–15). |
| Davis Selected Advisers | "DSA frequently follows the practice of aggregating orders of various institutional clients for execution, when DSA believes that this will result in the best net price and most favorable execution. In such event, the allocation will be made by DSA in the manner considered to be most equitable and consistent with its fiduciary obligations to all such clients. In certain cases where the aggregate order is executed in a series of transactions at various prices on a given day, each participating client's proportionate share of such order reflects the average price and commission rate paid or received with respect to the total order placed on that day. In some instances, this procedure could adversely affect a given client, but DSA believes that any disadvantage in the procedure would be outweighed by the increased selection available and the increased opportunity to engage in volume transactions." (Wachovia Mem. Ex. 1 at 7). |
| Roxbury Capital Management | "Although each client account is individually managed, Roxbury often will, at any given time, purchase and/or sell the same securities for many accounts. When possible, Roxbury aggregates the same transactions in the same securities for many clients who have the same brokerage firm as custodian…. Clients in an aggregated transaction each receive the same price per share or unit[.] … If Roxbury has to place more than one order to fill all orders in an aggregated transaction, each client in the aggregated transaction receives the average price paid in all orders placed for clients in the same aggregate transaction in the same security on that day." (Wachovia Mem. Ex. 3 at 13). |
| Brandes Investment Partners | "Although each client account is individually managed, the firm often will, at any given time, purchase and/or sell the same securities for many accounts. It is the firm's practice, where feasible, to aggregate for execution as a single transaction ("batch") orders for the purchase or sale of a particular security for the accounts of several clients having the same brokerage firm as custodian." (Wachovia Mem. Ex. 5 at 54). |

Thus, through these disclosures, each Portfolio Manager disclosed to Morris that it would engage in the process of aggregation, even on occasions when the process might not work to Morris's benefit. In the Agreement, Morris acknowledged receipt of each of these disclosures. (SAC Ex. 1).

Moreover, exhibits 5 and 7 through 21 to the SAC reveal that it was the Portfolio Managers, not Wachovia, that made the decision to aggregate. These exhibits list orders for the execution of trades placed by the Portfolio Managers. For example, exhibit 5 lists orders placed by NWQ for

execution by Wachovia on December 27, 2001. As explained by Morris in the SAC, Wachovia executed on behalf of Morris a purchase order of 2222 shares of Agere Systems stock on December 27, 2001. (SAC ¶ 42). That order was aggregated with other orders to create an order to buy 4380 shares of the stock. (*Id.*) Exhibit 5 shows that the order originating from NWQ was for 4380 shares of Agere stock—*i.e.*, the total aggregated order. Therefore, exhibit 5 and all similar exhibits reveal that it was the Portfolio Manager, not Wachovia, that made the decision to aggregate.[8] Stated differently, if Wachovia had made the decision to aggregate, then the order originating from the Portfolio Manager would have been for 2222 shares, the number of shares that ultimately went into Morris's account.

Furthermore, there is no allegation in the SAC that any aggregation occurred beyond that which was specified by the Portfolio Managers. At oral argument, counsel for Morris contended that, for each instance of aggregation mentioned in the SAC, aggregation occurred twice— once on the initiative of the Portfolio Manager, and later at the initiative of Wachovia. (7/23/03 Tr. at 22:1–22:14). However, the SAC contains no allegation of multiple aggregation per transaction. In light of the concession of counsel for Morris at oral argument that exhibits 5 and 7 through 21 to the SAC document instances where Portfolio Managers placed aggregated orders, the SAC does not support the notion that Wachovia ever aggregated. Thus, aggregation, as it actually occurred as explained in the SAC and the documents referenced therein, was fully disclosed to Morris, and therefore constitutes neither a misrepresentation nor an omission. Consequently, Morris has failed to state a

claim under § 10(b) respecting the aggregation of trades.

Furthermore, even if the disclosures of Wachovia and Morris's Portfolio Managers were inadequate in some way, the Court must indulge several unreasonable assumptions for the practice of aggregation to have harmed Morris as he alleges in the SAC. First, in order for Morris's theory of loss causation to work, it would be necessary to assume that, on the occasions where his trades were aggregated, Morris's trades would have been the first trades executed had they not been aggregated. Assuming that Morris is correct in his statement that a large number of buy orders, or a large number of sell orders, will push the market away from the parties placing the orders, then the last party to place the order will receive the least advantageous price, while the first party placing an order will receive the most advantageous price. Therefore, for Morris to be harmed, as alleged, his trades would have to have occurred first every time. There is simply no basis for the assumption that is the predicate of this claim. It is no less likely that non-aggregated trades would have been executed in random order. Under such a scenario, Morris's trades would occur before the median trade half the time, and after the median trade the other half. Thus, over an extended period of time, Morris would be in substantially the same position as he would have been had his trades been aggregated. It also is no less likely that Morris's trades would have been executed last, under which scenario Morris would have benefitted every time from the aggregation of trades.

A second independent assumption that might be indulged to make Morris's theory

---

**8.** Exhibits 5 and 7 through 21 to the SAC are not self-explanatory, but at oral argument, both parties agreed that these exhibits docu-

ment the process just described. (7/23/03 Tr. at 10:2–11:16, 18:3–18:25).

work is that his Portfolio Managers would not place orders for clients other than Morris when they placed orders for Morris. That is, one could assume that Morris's orders would have been placed independently, and therefore would have been unaccompanied by the market-moving effects of a number of a large orders. But, that assumption is even more unreasonable than the previous one. The defining feature of the Masters Program is the service of Portfolio Managers, who, almost by definition, manage accounts for multiple clients, many of which have similar investing needs. The assumption that one of these Portfolio Managers would decide that the purchase or sale of a particular security at a particular time at particular price was wise and then order the purchase or sale for Morris's account, but no others, simply strains logic beyond the breaking point.

In sum, even if the Court accepts as true Morris's allegation that large block buy/sell orders incident to aggregation pushes the market away from the buyer/seller, Morris has not alleged facts necessary to support the inference that Morris was harmed by this process. Therefore, in addition to the fact that the disclosures made by Wachovia and the Portfolio Managers adequately disclosed the aggregation practice that took place, Morris has not shown actual economic harm resulting from the practice of aggregation.

### 3. The Alleged Inadequacy Of Morris's Periodic Reports

 Morris alleges that Wachovia failed to send him required periodic statements containing the exact information stated on his individual trade confirmations. (SAC ¶ 59). Rule 10b–10 allows for investors who have vested total discretion over their account with a fiduciary to waive trade confirmation, provided that the fiduciary supplies a periodic account statement containing the same information that would

have been in the trade confirmations. Morris notes that Wachovia did send him monthly account statements, but these statements did not include information that was on the trade confirmations:

> The account statements that Wachovia sent to [Morris] did not inform [Morris] that his trades were being aggregated nor did it inform him that his amounts were being rounded. The monthly account statements did not inform [Morris] that average price information was available upon request. The monthly account statements did not inform [Morris] that he was being charged the SEC Fee ... nor did they inform him that Wachovia was intentionally miscalculating the SEC Fee to its benefit. And, worst of all, the monthly statements stated that [Morris's] trades occurred at prices materially different from those stated in the individual trade confirmations.

(SAC ¶ 59). Morris then alleges that, in so failing to comply with Rule 10b–10, Wachovia harmed him "in that he never knew or had reason to suspect that Wachovia was surreptitiously extracting amounts from his account ... [and] he was misled by Wachovia as to the true cost and quality of the services provided by Wachovia in the Master's Program." (SAC ¶ 60). Therefore, argues Morris, Wachovia deprived him of the opportunity to make a fully informed decision about whether or not to participate in the Masters Program. (SAC ¶ 61).

In response to this allegation, Wachovia states that it complied with the requirements of Rule 10b–10. Wachovia notes that in a no-action letter issued by the SEC respecting the statement requirements under Rule 10b–10 for wrap fee accounts, the SEC found it to be sufficient for periodic reports to contain the information required by Rule 10b–10(a): (1) the date of each transaction; (2) the identity,

price and number of shares of each security purchased or sold; (3) any remuneration received by the broker in connection with each transaction; and (4) certain information regarding debt securities, which is not at issue in this case. (Deft. Mem. at 15) (citing Jonathan Kallman, SEC No–Action Letter, 1999 SEC No–Act. LEXIS 934, *1–2 (Aug. 23, 1999); 17 C.F.R. § 240.10b–10(a)). The monthly account statements, Wachovia asserts, contained all of this information. And, Wachovia argues that it did not state "materially different" prices on the trade confirmations. In cases where securities were purchased or sold for Morris's account as a part of aggregated transactions, therefore resulting in an average price being assigned, that price was truncated to three decimal places. (*Id.* at 16). Moreover, Wachovia asserts, even if it did not comply with Rule 10b–10, no private right of action exists under which Morris could challenge Wachovia's non-compliance.

It is unnecessary to decide whether Wachovia complied with the requirements of Rule 10b–10 or whether a private right of action exists to enforce the requirements of Rule 10b–10 because Morris has failed to allege facts to satisfy either the transaction causation or the loss causation requirements of § 10(b).[9] Morris has not alleged that had he known that Wachovia would not comply with Rule 10b–10, he would not have subscribed to the program. Indeed, because the portions of Rule 10b–10 upon which Morris relies require broker-dealers to perform specified acts *after* the consummation of securities transactions, it is highly doubtful that a Rule 10b–10 violation could ever independently satisfy transaction causation requirement.

And, he has not explained how Wachovia's alleged non-compliance with Rule 10b–10 caused him any financial harm. It may be the case that Wachovia's alleged violation of Rule 10b–10 allowed it to conceal other allegedly fraudulent conduct—specifically the imposition of SEC Fees—but that does not amount to an independent harm to Morris. At most, the alleged violation of Rule 10b–10 is evidence of scienter on the SEC Fees claims under Rule 10b–5. In sum, Morris has not satisfied the pleading requirements respecting causation as to this claim. *See Gasner*, 103 F.3d at 360.

### 4. The Pass–Along Of SEC Fees And Rounding–Up Of Those Fees On Aggregated Transactions

■ The most troubling claim that Morris raises in the SAC is that, contrary to its representations that the Wrap Fee was all-inclusive, Wachovia passed along to investors the "SEC Fees" that it was required to pay on certain transactions. The SEC Fees to which Morris refers are those fees that, under § 31 of the 1934 Act, the National Association of Securities Dealers ("NASD") and the national securities exchanges, such as the New York Stock Exchange ("NYSE"), must pay based upon the dollar amount of sales of certain securities ("SEC Fees" or "Section 31 fees"). 15 U.S.C. § 78ee. For each transaction Wachovia executed on the part of Morris that generated such a fee, Wachovia passed the fee along to Morris. And, because the fee attributable to any single investor's single transaction, or portion of an aggregated transaction, often would be calculated to fractions of a cent, Wachovia would round up the fee amount to the nearest cent.[10] Therefore, Morris

---

**9.** As noted above, the fact that Morris purports to raise a claim under Rule 10b–10 rather than 10b–5 does not eliminate the requirement that Morris must state a violation of § 10(b) in order to pursue a claim for a violation of any rule promulgated thereunder.

*Central Bank of Denver,* 511 U.S. at 174–76, 114 S.Ct. 1439.

**10.** The practice of rounding up when passing along Section 31 fees is apparently standard practice in the industry, (SAC Ex. 23), and

was charged not merely the Section 31 Fee, but rather he was assessed the fee rounded up to the nearest cent. In passing along the rounded-up fee, Morris argues, Wachovia turned the SEC Fee into a profit center, collecting fractions of a cent each time the fee was passed along. (SAC ¶ 49). According to Morris, he "was damaged by Wachovia's surreptitious charging of the Section 31 fee in that (1) it depleted the value of his account; (2) it prevented him from knowing the true value of his Wrap Fee; and (3) it prevented [him] from understanding the full panoply of fees being levied by Wachovia for its services." (SAC ¶ 52).

In addition, while Morris does not take issue with rounding up in every case, he argues that Wachovia enhanced its profit from the SEC Fees through the manner in which it calculated how it would pass along the fee associated with an aggregated transaction to the individual investors participating in that transaction:

> Rather than following the rules and calculating a single SEC Fee based on "aggregate dollar volume" then rounding that single amount upwards, Wachovia divided the SEC Fee many times, amongst all of the participants in the aggregated trade, and rounded each piece upwards. For example, if the single SEC Fee for a twenty-lot aggregated sale was $50.3452345, rather than rounding up a single time to $50.35, Wachovia divided the unrounded SEC Fee by twenty, improperly passing each piece ($2.5172617), on to the Masters Program investor and then rounded each piece up to $2.52. This practice resulted in Wachovia rounding-up the SEC Fee *twenty times*, rather than the *single time allowed* by the NASD and NYSE. Wachovia's intentional improper calculation of the SEC fee allowed it to

collect $50.40 from its customers—in the example cited herein when the amount the firm owed as its SEC Fee liability would be only $50.35. As a result of this scheme, Wachovia was able to pocket extra profit on each transaction—all to the detriment of its customers.

(SAC ¶ 56). Morris then lists the approximately 300 transactions where Morris was "over-charged" the Section 31 fee in connection with an aggregated transaction. (*Id.*)

Morris acknowledges that, on page 11 of the Disclosure Document, in a footnote to a fee schedule, Wachovia stated that "[t]he [wrap] fee does not include certain dealer markups and markdowns including offering concessions, odd lot differentials, transfer taxes, *exchange fees and any other fees required by law which . . . will be charged on transactions.*" But, Morris argues, this "disclosure was totally inadequate. The SEC Fee is not an 'exchange fee.' Nor is it a fee 'required by law' to be passed on to [Morris] . . . . [T]he SEC Fee is a *transaction fee* that may or may not be passed on to [Morris]. Wachovia represented to [Morris] . . . that the Wrap Fee included all *transaction fees.* Therefore, the levying of the SEC Fee, a transaction fee, was contrary to Wachovia's clear representation." (SAC ¶ 49 (emphasis added)).

Wachovia admits both that it passed along the SEC Fee and that it rounded the fee in the manner alleged by Morris. However, Wachovia argues that the statement in the Disclosure Document quoted above constitutes a full disclosure because the SEC Fee is either an "exchange fee" or "other fee[ ] required by law" that "the client's account will be charged on transactions." According to Wachovia, whether the SEC Fee is an "exchange fee" or an

Morris does not challenge the practice of rounding generally, although, as discussed below, he does challenge the manner in which Wachovia rounded on certain transactions.

"other fee required by law" depends on where and how the trade is conducted: Section 31 requires that national securities exchanges (such as the NYSE) pay fees on sales of securities that take place on a national securities exchange. 15 U.S.C. § 78ee(b). In those instances, the Section 31 fee is commonly referred to as an "exchange fee." When sales of securities are transacted through means other than a national securities exchange, national securities associations (such as the NASD) pay the Section 31 fees. 15 U.S.C. § 78ee(c). In these instances, the Section 31 fee is an "other fee required by law."

(Deft. Mem. at 13). Furthermore, notes Wachovia, the amount charged to Morris as SEC Fees was prominently displayed on the trade confirmations, of which Morris waived receipt. (*See* Wachovia Mem. Ex. 7). Respecting the allegation that it over-charged the SEC fee on aggregated transactions, Wachovia argues that its method of calculating fees was approved by the Seventh Circuit in *Rosin v. New York Stock Exchange, Inc.*, 484 F.2d 179, 180 (7th Cir.1973).

The parties thus dispute the adequacy of Wachovia's disclosure, and, apart from the adequacy of Wachovia's disclosure, they dispute whether Wachovia's method of passing along SEC fees to individuals on aggregated transactions was appropriate.

#### a. Disclosure

One of Wachovia's prominent selling points in promoting the Masters Program was the fact that investors would pay one Wrap Fee and not be nickel-and-dimed at every turn. In the marketing literature, Wachovia states that it charges an "annual fee [that] covers the comprehensive services vital to successfully managing a significant investment portfolio [including] [a]ll securities transaction costs, ... investment manager's fees ... [and] custody of securities." (SAC Ex. 3). Only when confronted with the legal documentation does the prospective Masters Program participant get the first inkling that the Wrap Fee is not all-inclusive as advertised. In the Agreement, Wachovia states again that "the Service has a wrap fee schedule (i.e., there are no separate charges for execution services or Masters Manager fees)" and then directs the investor to "[s]ee disclosure document for details of fee exclusions." (SAC Ex. 1). The Disclosure Document then states as follows:

> **MASTERS FEES**: Fees for Masters accounts are only offered on a wrap fee basis covering all of our execution, consulting and custodial services as well as each advisor's management fee for the advisor's services.

(SAC Ex. 2 at 11). Then, in a footnote following a fee schedule several lines below the above-quoted language, Wachovia states that "[t]he [wrap] fee does not include certain dealer markups and markdowns including offering concessions, odd lot differentials, transfer taxes, exchange fees and any other fees required by law which ... will be charged on transactions." (*Id.*)

Thus, there is a disclosure that "exchange fees" and "any other fees required by law ... will be charged on transactions." While it is true that the strange location of a certain piece of information in a disclosure document alone does not make the disclosure inadequate, *see Maywalt v. Parker & Parsley Petroleum Co.*, 808 F.Supp. 1037, 1057–58 (S.D.N.Y.1992), it is rather obvious that the vast majority of Wachovia's statements respecting fees indicate that the Wrap Fee would encompass all fees. Only in a footnote buried in the Disclosure Document does Wachovia disclose that "exchange fees" or "other fees required by law" will be charged on transactions in addition to the Wrap Fee. Nev-

ertheless, this disclosure did place Morris on notice that some additional fees would be charged on transactions in his account.

Still, several questions about this disclosure remain unanswered at this stage in the proceedings. This first is whether this disclosure was adequate to disclose the charging of an SEC Fee on the transactions where it was charged. The next question is whether the SEC Fees qualify as either "exchange fees" or "other fees required by law." It is undisputed that the SEC fees are required by law to be paid by exchanges such as the NYSE. However, it is also undisputed that the SEC Fees do not by law have to be passed to investors. And, there is no basis on this record for concluding that they are usually passed along to investors. In sum, whether the SEC is an "exchange fee" or a "fee required by law," as Wachovia contends, or is a "transaction fee," as Morris contends, is a matter for further factual development and, as such, cannot be resolved on a motion to dismiss under Rule 12(b)(6).[11]

### b. Multiple Rounding On Aggregated Transactions

The validity of Wachovia's method of calculating the SEC Fee to be charged to each individual investor for his or her portion of aggregated transactions is not apparent from the record at this stage. Wachovia argues that the Seventh Circuit's decision in *Rosin* sanctifies their method. There, the Seventh Circuit noted that, because the Section 31 fee is imposed on a per transaction basis, it is economically impracticable to aggregate each individual customer's transactions over a prolonged period of time in order to avoid over-

charging clients. *See* 484 F.2d at 184. While this statement may be correct, it only addresses the practice of rounding generally, a practice that is not in dispute here. Here, Morris disputes whether the method of rounding used by Wachovia with aggregated transactions (*i.e.*, dividing the fee, then rounding, as opposed to rounding and then dividing) is permissible Although the *Rosin* case is not entirely on point, the reasoning employed there—*i.e.*, that rounding is acceptable to avoid high costs of precise calculation—might well apply here. However, *Rosin* was decided on summary judgment and thus there was a record to support the district court's finding that it would be just too costly to achieve precise calculation in the context considered in *Rosin.* There is no record here to permit a finding that the method used by Wachovia is necessary to avoid a high cost of precise calculation. And, there is no record to support Wachovia's contention that this *is* a matter of accepted industry practice.

All the other requirements of § 10(b), Rule 9(b) and the PSLRA are satisfied as to this claim. Because the purchase or sale of securities is essential to the alleged fraud, the "in connection with the purchase or sale of securities" element is satisfied. *See SEC v. Zandford,* 535 U.S. 813, 820–21, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002). Morris has alleged transaction causation, (SAC ¶ 78), and the loss causation is patent. Morris likewise adequately has alleged materiality, reliance, and scienter. Furthermore, the claim is clearly stated with specificity and adequate support. Thus, the motion to dismiss this aspect of

---

11. Wachovia also argues that, notwithstanding the adequacy of the disclosure in the Disclosure Document, the imposition of Section 31 fees was prominently disclosed on Morris's trade confirmations, and cites *Rosin* for the proposition that such disclosure is adequate. *See* 484 F.2d at 184. In this case, however, unlike *Rosin,* the plaintiff waived receipt of trade confirmations, and the defendant broker failed to note the imposition of Section 31 fees on monthly statements, which, under Rule 10b–10, are to contain all information contained in waived trade confirmations.

Morris's claim under § 10(b) and Rule 10b–5 is denied.

## B. Morris's Claim Under The Investment Advisers Act of 1940

In his Third Claim in the SAC, Morris alleges that Wachovia's conduct violated of the investment advisers Act of 1940. The IAA regulates the conduct of investment advisers [12] and proscribes both fraud on the part of investment advisers (IAA § 206(1)), and any act by an investment adviser that may operate as a fraud or deceit upon that adviser's clients or prospective clients (§ 206(2)). Section 206 states in full as follows:

It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

(3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction;

(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

See 15 U.S.C. § 80b–6. Morris does not state explicitly which subsection of § 206 that he believes that Wachovia violated, but the language used in the SAC suggests that he is alleging a violation of subsection (2). In Paragraph 89, Morris alleges that Wachovia "knowingly and/or recklessly engaged in . . . practices and courses of business which operated as a fraud upon the Plaintiff[.]" (SAC ¶ 89). Because this language tracks that of subsection (2), Morris's IAA claim will be treated as one that alleges a violation of § 206(2). [13]

Paragraph 89 of the SAC continues by asserting that:

The purposes and effect of said scheme, practice and course of conduct was to create the illusion that (1) aggregation was only being performed in Plaintiff's account when such aggregation would

---

12. Wachovia is a registered investment advisor under the IAA. (SAC Ex. 1 ¶ 13).

13. Neither subsections (3) nor (4) could reasonably apply in this case. Subsection (3) prohibits investment advisers from acting as principals for their own accounts when purchasing and selling securities for clients, and Morris has not alleged that Wachovia engaged in such conduct. Subsection (4) makes it unlawful for investment advisers to engage in "fraudulent, deceptive, or manipulative" courses of businesses, and to that extent, repeats the proscription in subsection (2). But subsection (4) then grants the SEC the authority to define what constitutes such conduct and enact rules designed to prevent such acts. Because Morris has not identified any SEC regulation that Wachovia has violated, his claim cannot be fairly interpreted to be one arising under subsection (4).

result in a lower commission or more advantageous net price; (2) Wachovia was not charging Plaintiff any "transaction" fees in Excess of the Wrap Fee; (3) Wachovia was properly calculating the SEC Fee; (4) Wachovia, in the account statements, was properly disclosing to Plaintiff the costs and execution prices for his Masters Program trades; and (5) Wachovia was acting, pursuant to its fiduciary duty, in a disinterested capacity when selecting the [Portfolio Managers].

And, paragraph 90 alleges that:

Wachovia participated in the wrongdoing complained of herein in order to prevent Plaintiff and the Class members from knowing of Wachovia's acts of (1) increasing its profitability at Plaintiff's and the Class members' expense by aggregating orders; (2) charging Plaintiff and the Class members the SEC Fee; (3) intentionally, improperly calculating the SEC Fee to the Plaintiff's and the Class members' detriment in order to turn the transaction charge into a profit center; and (4) to the detriment of Plaintiff and the Class members, using the Masters Program as a tool to extract additional revenue from the [Portfolio Managers].

Although the IAA creates broad fiduciary duties, and proscribes conduct that is not outright fraud, the remedies under the IAA are quite limited. In *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, the Supreme Court held that, although § 206 creates fiduciary standards for investment advisers, it creates no private right of action for damages. *See* 444 U.S. 11, 19–24, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Only § 215 of the IAA creates any private right of action. *Id.* at 19, 100 S.Ct. 242. Section 215 declares that any investment adviser contract, the formation or performance of which violates the IAA, shall be void.[14] Implicit in Congress's statement that certain contracts shall be void, held the Supreme Court in *Transamerica*, is the power of a private party to sue for rescission or for an injunction against continued enforcement of the contract, and for restitution. *Id.* at 17–18, 100 S.Ct. 242; *see also Goldstein v. Malcolm G. Fries & Assoc., Inc.*, 72 F.Supp.2d 620, 625 (E.D.Va.1999). In contrast, § 206, while proscribing certain conduct, "does not in terms create or alter any civil liabilities." *Transamerica*, 444 U.S. at 19, 100 S.Ct. 242. Thus, any private right of action under the IAA must arise, if at all, under § 215, and the only remedies available are rescission, injunction, and restitution. Importantly, though, the Supreme Court has explained that the rescission remedy available under § 215 is quite limited.

---

**14.** Section 215 states in full as follows:
(a) Waiver of compliance as void

Any condition, stipulation, or provision binding any person to waive compliance with any provision of this subchapter or with any rule, regulation, or order thereunder shall be void.

(b) Rights affected by invalidity

Every contract made in violation of any provision of this subchapter and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subchapter, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

15 U.S.C. § 80b–15.

Where rescission is awarded, the rescinding party may of course have restitution of the consideration given under the contract, less any value conferred by the other party. Restitution would not, however, include compensation for any diminution in the value of the rescinding party's investment alleged to have resulted from the adviser's action or inaction. Such relief could provide by indirection the equivalent of a private damages remedy that we have concluded Congress did not confer.

*Id.* at 25 n. 14, 100 S.Ct. 242 (internal citation omitted).

■■■ In order to determine whether a contract is voidable under § 215, there first must be a violation of the IAA—in this case, a violation of § 206(2). Unlike § 10(b) of the 1934 Act, and even § 206(1), § 206(2) is more than an anti-fraud provision because it establishes fiduciary duties for investment advisers. The Supreme Court has held that the IAA reflects a "congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or subconsciously—to render advice which was not disinterested." *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 191–92, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Thus, the IAA creates a fiduciary duty on the part of investment advisers to exercise good faith and fully and fairly disclose all material facts to their clients, and an affirmative obligation "to employ reasonable care to avoid misleading [their] clients." *Id.* at 194, 84 S.Ct. 275. Accordingly, a party alleging a

violation of § 206 need not show "intent to injure and actual injury to clients" as is required by § 10(b).[15] *Id.* All that need be shown is that (1) the Defendant is an investment adviser; (2) the Defendant used the mails or any other means or instrumentality of interstate commerce, directly or indirectly (3) to make a misstatement or omission of material fact to a client or prospective client; and (4) the Defendant acted negligently.[16] *Id.* at 191–92, 194, 84 S.Ct. 275; *SEC v. Blavin,* 760 F.2d 706, 711 (6th Cir.1985); *SEC v. Batterman,* 2002 WL 31190171, *8 (S.D.N.Y.) (unpublished); *see also SEC v. Financial News Assoc.,* 1985 WL 25023, *9 (E.D.Va. 1985) (quoting *SEC v. Wall Street Publishing Institute, Inc.,* 591 F.Supp. 1070, 1083 (D.D.C.1984)).

■■■ Here, Morris's allegations in the SAC satisfy the four elements of a claim under § 206(2). First, Morris has alleged that Wachovia is an investment adviser under the IAA, an allegation that Wachovia does not refute. (SAC ¶ 88). Second, Morris has alleged that "[i]n connection with the acts, conduct and other wrongs alleged in this [Second] Amended Complaint, Wachovia, directly or indirectly, used the means and instrumentalities of interstate commerce, including mail and telephone conversations." (SAC ¶ 6). Third, Morris has alleged that Wachovia misrepresented material facts to a prospective or current client. Fourth, and finally, Morris has alleged that Wachovia's actions were either reckless or knowing, states of mind more culpable than the

**15.** Because no showing of actual injury is required, it logically follows that no showing of reliance is required either. *See SEC v. Blavin,* 760 F.2d 706, 711 (6th Cir.1985).

**16.** Proof of each of these elements would be a violation of § 206(2), the subsection of § 206 with the broadest proscriptive reach. *See Capital Gains,* 375 U.S. at 186–92, 84 S.Ct. 275.

In contrast, subsection (1) is a traditional antifraud provision and requires proof of scienter in order to establish a violation. *Steadman v. SEC,* 603 F.2d 1126, 1134 (5th Cir.1979); *SEC v. Batterman,* 2002 WL 31190171, *8 (S.D.N.Y.) (unpublished); *In The Matter Of Jamison, Eaton & Wood, Inc.,* Investment Advisers Act Release No. 2129, 2003 WL 21099127, *3–*4 (May 15, 2003).

negligence required under § 206(2). (SAC ¶ 89). Therefore, under the Rule 12(b)(6) standard, Morris has stated a claim for a violation of § 206, thus triggering § 215 and allowing the limited private right of action for rescission that he seeks therein.

Wachovia argues that Morris also must satisfy Rule 9(b) because his IAA claim is based on allegations of fraud, and that Morris has not done so in this case. Morris does not dispute Wachovia's assertion that Rule 9(b) applies, but argues that he has satisfied the standard with respect to his IAA claim. As an initial matter, it is not clear that Rule 9(b) applies in this case because the claim arises under § 206(2), a provision that is not appropriately characterized as an anti-fraud provision. *Capital Gains*, 375 U.S. at 191–92, 84 S.Ct. 275. This question need not be resolved, however, because Morris has satisfied the requirements of Rule 9(b).

Rule 9(b) requires that "the circumstances constituting fraud or mistake shall be stated with particularity." As another district court has explained, under Rule 9(b), "[p]articularity of pleading is required with regard to the time, place, speaker, and contents, as well as the manner in which statements are false and the specific acts raising an inference of fraud—the 'who, what, where, why and when.'" *First Union Corp.*, 128 F.Supp.2d at 884. When the fraud alleged is based on an omission of material fact, Rule 9(b) requires that plaintiffs plead the type of facts omitted, the place in which the omission should have appeared, and the way in which the omitted facts made the defendant's affirmative representations misleading. *See generally* 2 James Wm. Moore, *et al.*, Moore's Federal Practice § 9.03[1][b] (citing *Solow v. Stone*, 994 F.Supp. 173, 182 (S.D.N.Y.1998); *Fujisawa Pharm. Co. v. Kapoor*, 814 F.Supp. 720, 727 (N.D.Ill. 1993)). Rule 9(b) also requires that plaintiffs disclose in their pleading the sources upon which their allegations rest so that courts may evaluate the sufficiency of the allegations in light of the reliability of the sources. *First Union Corp.*, 128 F.Supp.2d at 884.

In assessing whether a plaintiff has satisfied the requirements of Rule 9(b), courts must be mindful that the principle purpose behind the rule is to prevent strike suits. *In re Initial Public Offering Securities Litigation*, 241 F.Supp.2d 281, 325–26 (S.D.N.Y.2003); *Arnlund v. Deloitte & Touche LLP*, 199 F.Supp.2d 461, 471 (E.D.Va.2002). Thus, while mere incantation of the word "fraud" is clearly insufficient, Rule 9(b) does not require a dissertation. Rather, a concise statement of "who, what, where, how and why" is sufficient to prevent the abuses the that give rise to the rule. *See In re Initial Public Offering Securities Litigation*, 241 F.Supp.2d at 327.

Morris has satisfied this standard here with respect to the conduct that gives rise to Morris's § 206(2) allegation. The 84-page SAC is replete with details respecting the who, what, where, how, why and when of his claims. As demonstrated by its briefing and oral argument on this motion to dismiss, Wachovia understands fully the bases for the allegations against it. Accordingly, Morris has satisfied the requirements of Rule 9(b) as to his claim under the IAA.

## CONCLUSION

For the foregoing reasons, Wachovia's Motion to Dismiss the Second Amended Complaint is GRANTED in part and DENIED in part.

The Clerk is directed to send a copy of this Order to all counsel of record.

It is so ORDERED.