Alfred ZAKLIT, et al., Plaintiffs,

v.

**GLOBAL LINGUIST SOLUTIONS, LLC, et al., Defendants.**

**No. 1:14cv314 (JCC/JFA).**

United States District Court, E.D. Virginia, Alexandria Division.

Signed Sept. 16, 2014.

---

Brent S. Buchsbaum, Gary R. Carlin, Laurel N. Haag, Sang J. Park, Law Offices of Carlin and Buchsbaum LLP, Long Beach, CA, John B. Simpson, Robert Emmet Byrne, Jr., Martinwren PC, Charlottesville, VA, for Plaintiffs.

## MEMORANDUM OPINION

JAMES C. CACHERIS, District Judge.

This matter is before the Court on Defendant Global Linguist Solutions, LLC's ("Defendant" or "GLS") Motion to Dismiss the Second Amended Complaint [Dkt. 113] and Motion to Strike Plaintiffs' Jury Demand [Dkt. 115]. For the following reasons, the Court will grant in part and deny in part Defendant's Motion to Dismiss the Second Amended Complaint and will grant Defendant's Motion to Strike Plaintiffs' Jury Demand.

### I. Background

#### A. Factual History

A detailed summary of the facts of this case is set forth in this Court's July 8 Memorandum Opinion, 2014 WL 3109804, granting in part and denying in part Defendant's Motion to Dismiss the Amended Complaint [Dkt. 100]. Briefly, Defendant provides translation and interpretation services to the United States Army. (Second Am. Compl. [Dkt. 102] ¶¶ 11–12.) Plaintiffs are linguists who either currently work or have worked for Defendant in Kuwait. (Id. ¶¶ 2–4, 11–12.) Plaintiffs were deployed to Kuwait in mid–2012 to work on U.S. Army bases, initially under contract with one of Defendant's subcontractors, Engility. (Id. ¶¶ 14, 22.)[1] Plaintiffs allege that immediately upon arrival in Kuwait, Defendant "took their passports" to obtain work visas from its Kuwaiti sponsor, Al Shora International General Trading & Contracting ("Al Shora"). (Id. ¶ 16.) Furthermore, Plaintiffs allege that Defendant "prohibited Plaintiffs from working or leaving the [Army bases] for medical appointments, personal time, or even emergency matters." (Id. ¶ 19.) According to Plaintiffs, "[t]hey were told by GLS that they would be arrested, imprisoned, and/or deported by the Kuwaiti government if they left the camp." (Id.) Conditions in the camp were "abominable" and "substandard." (Id. ¶ 20.) "Forty Linguists were assigned to live in one 3,000–square–feet tent with limited air condition, running water and electricity." (Id.)

When Defendant was awarded a new contract with the U.S. Army, it changed two key contractual relationships. First, in early December 2012 it sought to terminate its local sponsorship agreement with Al Shora, leading to a dispute between the two companies over whether such termination was effective. (Id. ¶ 28.) Second, it contracted directly with Plaintiffs in late January 2013. (Id. ¶ 28.)

Plaintiffs' case revolves around these changes. First, Plaintiffs allege they were not aware that Defendant and Al Shora were involved in a contract dispute. (Id. ¶ 28(f).) According to Plaintiffs, when they signed Defendant's 2013 employment contracts "GLS's employment of Plaintiffs in Kuwait was unlawful since GLS was unable to obtain Al Shora's agreement to continue sponsoring Plaintiffs for GLS or to transfer their sponsorship to another Kuwaiti entity." (Id. ¶ 28(d).) This lack of sponsorship was material and Plaintiffs contend they would not have signed the employment contracts had they known their sponsorship was in doubt. (Id. ¶ 28(g).)

---

1. This Court granted Defendant's Motion for Judicial Notice of the Engility contracts. (July 8 Mem. Op. at 2 n. 2.) Though Plaintiffs claim they worked for Defendant prior to their arrival in Kuwait in 2012, the Engility contracts plainly provide otherwise. *See id.*

Second, Plaintiffs allege that Defendant "forced Plaintiff to sign new form employment contracts directly with GLS under [the abovementioned] horrid conditions." (*Id.* ¶ 22.) Plaintiffs claim that the new contracts removed many benefits from their prior contracts with Engility. (*Id.* ¶ 23.) According to Plaintiffs, Defendant "expressly told" them to "sign the form without reading anything." (*Id.* ¶ 24.) Plaintiffs "did not believe the form was a contract because they had no opportunity to negotiate the terms of the agreement [nor were] given a choice not to sign it." (*Id.* ¶ 25.) Additionally, Defendant "never suggested to them that they should discuss the terms with a lawyer." (*Id.* ¶ 25.) Plaintiffs felt "they had no choice but to sign the form because GLS threatened to kick them off the base, [subjecting] them to immediate arrest and detention by Kuwaiti official [sic] if they did not sign the form." (*Id.* ¶ 26.) At the time they signed the contracts, Plaintiffs "were under GLS's total control and domination because [GLS] held their passports." (*Id.* ¶ 27.) Plaintiffs were also "ill from the abominable living conditions[.]" (*Id.*) "So [Plaintiffs] reluctantly signed the form without assenting to its terms." (*Id.* ¶ 27.)

## B. 2013 Contract with Defendant

As noted above, Plaintiffs signed new employment contracts directly with Defendant. These contracts are uniform and contain a "Governing Law" section. This section, first found in Section 18 of the contract, contains a jury waiver provision.[2] (*See* Def.'s Mot. to Dismiss Mem. [Dkt. 114], Phillips Decl., Ex. 1.) It states "[b]oth parties hereby agree and consent to waive the right to a trial by jury." (*Id.* at 8.)[3]

Section 9 of Attachment A to the contract provides as follows: "This Agreement shall be governed by and interpreted under the laws of the Commonwealth of Virginia of the United States of America." (*Id.* at 11.) Section 18 contains a cross-reference to the Governing Law provision in Attachment A. (*Id.* at 8.)

In addition to this section, the contracts make clear that Plaintiffs are at-will employees. The contracts specifically state that GLS has the right "at its sole discretion" to terminate its employment relationship with Plaintiffs "without cause at any time" and that Plaintiffs likewise "may voluntarily terminate this Agreement at any time." (*Id.*) Additionally, Defendant will "provide return transportation from the Employee's work location to the IRDO [Individual Replacement Deployment Operations] for theater outprocessing if this Agreement is terminated," (*id.* at 8), but cautioned that "[t]ravel could be significantly restricted, delayed or made more difficult by operational requirements of the military or by restrictions imposed by civil authorities[.]" (*Id.* at 4.) The contracts also provide that "this assignment carries the risk of bodily harm/death," and "[l]iving conditions at the assignment location could be remote and uncomfortable." (*Id.*)

The contracts outline employee benefits. Under the contracts, the positions are salaried. (*Id.* at 4.) The standard work schedule is set at twelve hours a day, six days per week, which could be more or less at the Defendant's discretion. (*Id.* at 11.) Per the terms of the contract, employees are not entitled to any overtime pay. (*Id.* at 2.) Nor are employees entitled to salary

---

**2.** The Court may consider Plaintiffs' 2013 employment contracts with Defendant because the Second Amended Complaint incorporates them by reference. *See Philips v. Pitt Cnty.*

*Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

**3.** Pagination of the contracts is CM/ECF pagination.

for "any time not worked by reason of illness, injury, disability, or any other medical reason." (*Id.* at 5.) Paid time off ("PTO") accrues on a biweekly basis, with five days of PTO for twelve months of service based on a twelve hour work day and a six day work week. (*Id.* at 11.)

## C. Procedural History

In the July 8 Memorandum Opinion, this Court granted in part and denied in part Defendant's Motion to Dismiss the Amended Complaint. As a threshold matter, the Court rejected Plaintiffs' arguments that Kuwaiti law applied. Instead, giving full force to the choice-of-law provision contained in the employment contracts, Virginia law applied to the case. (July 8 Mem. Op. at 21–30.) Nine of the eleven causes of action were dismissed; only the false imprisonment and fraud claims survived. (*Id.* at 53.) The Court granted Plaintiffs' leave to file a second amended complaint and reserved ruling on the motion to strike until the Second Amended Complaint was filed. (*Id.*)

In the Second Amended Complaint now before the Court, Plaintiffs allege eight causes of action: false imprisonment ("Count 1"); intentional infliction of emotional distress ("Count 2"); negligent infliction of emotional distress ("Count 3"); fraud ("Count 4"); rescission ("Count 5"); promissory fraud ("Count 6"); breach of contract ("Count 7"); and violation of Kuwaiti labor law ("Count 8").

Defendant has moved to dismiss the Second Amended Complaint in its entirety and strike Plaintiffs' jury demand. Having been fully briefed and argued, Defendant's motions are now before the Court.

## II. Standard of Review

■ "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint[.]" *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992)

(citation omitted). The Supreme Court has stated that in order "[t]o survive a motion to dismiss, a [c]omplaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The issue in resolving such a motion is not whether the non-movant will ultimately prevail, but whether the non-movant is entitled to offer evidence to support his or her claims.

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937 (citations omitted). While legal conclusions can provide the framework for a complaint, all claims must be supported by factual allegations. *Id.* Based upon these allegations, the court will determine whether the plaintiff's pleadings plausibly give rise to an entitlement to relief. *Id.* To survive a motion to dismiss, a plaintiff's complaint must demand more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937; *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. Legal conclusions couched as factual allegations are not sufficient. *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. Hence, a pleading that offers only "formulaic recitation of the elements of a cause of action will not do." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937; *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955. Nor will a complaint that tenders mere "naked assertion[s]" devoid of

"further factual enhancement." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937; *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955.

Moreover, the plaintiff does not have to show a likelihood of success on the merits. Rather, the complaint must merely allege-directly or indirectly-each element of a "viable legal theory." *Twombly*, 550 U.S. at 562–63, 127 S.Ct. 1955. At the motion to dismiss stage, the court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

### III. Analysis

#### A. Choice of Law

 In their memorandum opposing the motion to dismiss, Plaintiffs contend that their complaint raises new factual allegations that the choice-of-law provision was procured as a result of unequal bargaining power between the parties. At the hearing, Plaintiffs' counsel changed course and stated that they were not again challenging the choice-of-law provision. Even if this point were not conceded, however, the choice-of-law provision would be enforceable. First, Plaintiffs' general allegations about the circumstances surrounding the signing of the employment contracts are not enough to invalidate the choice-of-law provision. For the purposes of determining the enforceability of a choice-of-law provision, such general allegations are irrelevant. The disparity in bargaining power must have specifically resulted in the inclusion of the provision, and there is no evidence that happened here. *See Faltings v. Int'l Bus. Machs. Corp.*, No. 87–1123, 1988 WL 83316, at *3 (4th Cir. Aug. 4, 1988) (stating under Virginia law, choice-of-law provision is to be given effect

unless "there was no reasonable basis for the parties' choice or where one of the parties was misled into agreeing to the *provision.*") (emphasis added) (citations omitted); *Middleburg Training Center, Inc. v. Firestone*, 477 F.Supp.2d 719, 726 (E.D.Va.2007) (enforcing forum-selection clause because it did not appear that the "forum-selection *provision* at issue here was imposed by fraud or unequal bargaining power or was otherwise unreasonable.") (emphasis added); *Ash–Will Farms, L.L.C. v. Leachman Cattle Co.*, Nos. (Chancery) 02–195, (Chancery) 02–200, 2003 WL 22330103, at *2 (Va.Cir.Ct. Feb. 13, 2003) ("Absent a showing that the contract forum selection *clause* is unreasonable or *was imposed by fraud or unequal bargaining power*, the parties' choice should be enforced.") (emphasis added).[4]

 Second, Plaintiffs seek to portray themselves as powerless against GLS, arguing that the employment contracts are adhesion contracts. Plaintiffs' argument is unpersuasive. Under Virginia law, an adhesion contract is defined as a "standard form contract, prepared by one party and presented to a weaker party—usually a consumer—who has no bargaining power and little or no choice about the terms." *Senture, LLC v. Dietrich*, 575 F.Supp.2d 724, 727 n. 1 (E.D.Va.2008) (citation omitted) (internal quotation marks omitted). Plaintiffs' assertion that the inherent inequality in an employer-employee relationship automatically renders the employment agreements contracts of adhesion must be rejected. Simply because an employer and an employee do not stand on equal footing with respect to bargaining power does not magically transform an employment agreement into an adhesion

4. As other jurisdictions have noted, there is little difference between arbitration, forum-selection, and choice-of-law clauses for enforceability purposes. *Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir.1997).

contract. See *Torres v. SOH Distribution Co.,* No. 3:10C–CV–179, 2010 WL 1959248, at *3 (E.D.Va. May 13, 2010) ("Absent evidence of a bad-faith motive, disparity in bargaining power does not render a forum selection clause fundamentally unfair.") Rather, the test for determining whether an employment agreement is an adhesion contract is whether "an employee has the freedom to consider employment elsewhere and is not bound to continue working for his current employer." *Senture,* 575 F.Supp.2d at 727 n. 1 (citing *Schwam v. XO Commc'ns., Inc.,* No. 05–1060, 2006 WL 6884392, at *2 (4th Cir. Mar. 24, 2006)). If the employee has such freedom, an employment agreement will not be considered an adhesion contract. *Id.*

In this case, Plaintiffs had the ability to terminate the contract for any reason and to choose other employment. Under Section 16(a) of the contract, "the employee may voluntarily terminate this agreement at any time by providing a fifteen day written notice to the Employer." (Phillips Decl., Ex. 1 at 8.) Furthermore, if either party terminated the contract, Defendant was responsible for providing return transportation to the Individual Replacement Deployment Operations ("IRDO") for out-processing. (Phillips Decl., Ex. 1 at 8.)

With respect to arguments about the choice-of-law provision already raised and decided, Plaintiffs have not alleged any additional facts that would change this Court's prior analysis as set forth in the July 8 Memorandum Opinion. Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *TFWS, Inc. v. Franchot,* 572 F.3d 186, 191 (4th Cir.2009) (citations omitted) (internal quotation marks omitted). There are three exceptions to this rule: "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *Id.* at 191.

Plaintiffs have not argued that any of the exceptions should apply in this case. Regardless, none of the exceptions are applicable. The only plausible exception here is the third. To succeed, the challenging party has a "high burden" to show the prior decision was wrong. *TFWS,* 572 F.3d at 193. "A prior decision does not qualify for this third exception by being just maybe or probably wrong; it must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Id.* (citation omitted) (internal quotation marks omitted). Thus, it must be "dead wrong." *Id.* (citation omitted) (internal quotation marks omitted). Plaintiffs have made no showing that this Court's decision is "dead wrong." Thus, this Court finds its prior examination of the scope of the choice-of-law provision more than sufficient to dispose of this issue here. Therefore, Virginia law will apply to all of Plaintiffs' claims.

## B. GLS's Motion to Dismiss

Having determined what law to apply, the Court will turn to GLS's Motion to Dismiss. Each of Plaintiffs' claims is addressed in turn below.

### Count 1—False Imprisonment

Under Virginia law, false imprisonment is defined as the restraint of a person's liberty without sufficient cause. *Zayre of Va., Inc. v. Gowdy,* 207 Va. 47, 147 S.E.2d 710, 713 (1966). "If a person is under a reasonable apprehension that force will be used unless he willingly submits, and he does submit to the extent that he is denied freedom of action, this, in

legal contemplation, constitutes false imprisonment." *Id.* "To maintain an action for false imprisonment it is not necessary to show malice, ill will or the slightest wrongful intention, and neither the good faith of a defendant nor that of his employee will defeat a plaintiff's right to recover." *Id.*

■■■ Here, Plaintiffs allege that Defendant "acted with the intention of confining Plaintiffs within fixed boundaries." (Second Am. Compl. ¶ 63.) "By physical barriers and by means of unreasonable duress," Defendant restrained Plaintiffs' freedom of movement "by barring Plaintiffs and Class members [sic] from leaving the Army bases for any reason, including medical appointments, personal time and emergency matters." (*Id.* ¶ 64.) In addition, Plaintiffs allege that "[u]pon immediate arrival, GLS took their passports from them." (*Id.* ¶ 16.) Plaintiffs contend Defendant had no legal justification in preventing them from leaving the base. (*Id.* ¶ 63.)

Accepting these allegations as true and construing all inferences in Plaintiffs' favor, the Court is compelled to find that the Second Amended Complaint, although scant, sufficiently states a claim for false imprisonment against Defendant. *See Trull v. Smolka,* No. 3:08CV460–HEH, 2008 WL 4279599, at *7 (E.D.Va. Sept. 18, 2008) (finding claim of false imprisonment sufficiently pled where plaintiff alleged "[d]efendants required him to exit his home and ride to the hospital in an ambulance" and "he was afraid to disregard the [d]efendants' words, acts and/or threats.").

Defendant renews its previous grounds for dismissal of the false imprisonment claim. (Def.'s Mot. to Dismiss Mem. at 20.) As before, the Court finds those arguments unpersuasive. (*See* July 8 Mem. Op. at 31–32.)

Because Plaintiffs have stated a sufficiently plausible claim of false imprison-

ment to survive dismissal under Rule 12(b)(6), the Court will deny Defendant's motion as to Count 1.

## Count 2—Intentional Infliction of Emotional Distress

■■■ To succeed on a claim of intentional infliction of emotional distress in Virginia, the plaintiff must show "(1) the wrongdoer's conduct was intentional or reckless; (2) that his conduct was outrageous and intolerable, offending the generally accepted standards of decency and morality; (3) that there is a causal connection between the conduct and the emotional distress; and (4) that the resulting emotional distress was severe." *Ortiz v. Panera Bread Co.,* No. 1:10CV1424, 2011 WL 3353432, at *6 (E.D.Va. Aug. 2, 2011) (citing *Womack v. Eldridge,* 215 Va. 338, 210 S.E.2d 145, 148 (1974)). Intentional infliction of emotional distress claims are rarely successful. *Michael v. Sentara Health Sys.,* 939 F.Supp. 1220, 1233 (E.D.Va.1996) ("Because injury to the mind or emotions can be easily feigned, actions for intentional infliction of emotional distress are not favored in Virginia.") "The burden of proof for this claim is high and not often met, as the plaintiff must prove his or her case by clear and convincing evidence." *Ortiz,* 2011 WL 3353432, at *6 (citing *Ruth v. Fletcher,* 237 Va. 366, 377 S.E.2d 412, 416 (1989)).

■■■ Plaintiffs have failed demonstrate that Defendant's conduct meets the second element of a claim for intentional infliction of emotional distress, namely, that Defendant's conduct was so outrageous and extreme that it offends all notions of decency. When evaluating a claim for intentional infliction of emotional distress, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit re-

covery[.]" *Womack*, 210 S.E.2d at 148. A plaintiff must allege conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Russo v. White*, 241 Va. 23, 400 S.E.2d 160, 163 (1991) (citation omitted) (internal quotation marks omitted). This element "cannot be satisfied by [merely] alleging that the defendant's behavior was tortuous, or even criminal." *Ortiz*, 2011 WL 3353432, at *6.

■ Plaintiffs have not shown that Defendant's conduct meets this exacting standard. On the one hand, they contend that Defendant's alleged false imprisonment was so extreme and outrageous as to satisfy this element. (Second Am. Compl. ¶ 68.) In the next paragraph, however, they state that Defendant told them they were in danger of being "arrested, imprisoned, and/or deported by the Kuwaiti government if they left the base." (*Id.* ¶ 69.) In light of the latter admission, no reasonable fact finder could find Defendant's behavior extreme or outrageous.

Plaintiffs further allege that Defendant's failure to inform them that they were not legally entitled to work in Kuwait was extreme and outrageous conduct. (*Id.* ¶ 69.) Plaintiffs' argument is without merit. Even accepting as true these allegations, such an omission by Defendant is not "atrocious and utterly intolerable in a civilized society." Furthermore, Plaintiffs have not shown a causal connection between the failure to inform and their emotional distress. Presumably, the uncertainty surrounding their legal status would be most distressful during their time in Kuwait. However, Plaintiffs were not made aware of their legal status until July 2013. (Second Am. Compl. ¶ 28.) If Plaintiffs were unaware of their legal status, it is difficult to imagine how they could

be distressed during the time between signing the employment agreements in January 2013 until when they discovered their legal jeopardy in July 2013. (*See id.* ¶¶ 69–71.)

■ Even assuming, without deciding, that a reasonable jury could find in Plaintiffs' favor for the first three elements, Plaintiffs' claim must fail because they have not shown they suffered the emotional distress required to meet the final element. To satisfy this element, a plaintiff must show that "the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo*, 400 S.E.2d at 163.

Plaintiffs contend that the "horrid living conditions" arising from their false imprisonment caused them to get "very sick." (Second Am. Compl. ¶ 71.) Specifically, Plaintiffs state they had a "variety of physical illnesses, ranging from pneumonia to fevers to various infections, including eye and ear infections." (*Id.*) These allegations do not rise to the level of severe distress that no reasonable person could endure. *See Russo*, 400 S.E.2d at 161–63 (finding that plaintiff's nervousness, sleeplessness, stress and its physical symptoms, withdrawal from normal activities, and lack of concentration at work did not rise to the level of severe emotional distress); *see Molina v. Summer Consultants, Inc.*, LAW No. 152715, 1996 WL 1065653, at *3 (Va.Cir.Ct. Dec. 9, 1996) (finding plaintiff's allegations that she suffered shock, panic attacks, lost sleep, lost income, humiliation, stress, pain, suffering, medical expense, physical impact, and other injury as a result of her employer's alleged continued sexual harassment did not rise to the level of severe emotional distress).

Plaintiffs also allege that they suffered "severe emotional distress and anxiety" as a result of "being declared fugitives in a foreign country." (Second Am. Compl.

¶ 72). This caused Plaintiffs "to suffer additional illnesses and physical injuries, pain and suffering, inconvenience, medical expenses, future medical expenses, and other damages." (*Id.*) These allegations do not rise to the level of distress required to satisfy the final element of a claim for intentional infliction of emotional distress. Accordingly, the Court will grant Defendant's motion as to this count.

### Count 3—Negligent Infliction of Emotional Distress

■■■■ "The standard for negligent infliction of emotional distress is even more rigorous than the standard for intentional infliction of emotional distress." *Michael*, 939 F.Supp. at 1234. To survive a motion to dismiss on a claim for negligent infliction of emotional distress without physical impact, as is the case here, a plaintiff must plead "that his physical injury was the natural result of fright or shock proximately caused by the defendant's negligence." *Hughes v. Moore*, 214 Va. 27, 197 S.E.2d 214, 219 (1973); *see Myseros v. Sissler*, 239 Va. 8, 387 S.E.2d 463, 465–66 (1990). In other words, to state a claim for relief, a plaintiff must show "a clear and unbroken chain of causal connection between the negligent act, the emotional disturbance, and the physical injury." *Hughes*, 197 S.E.2d at 220.

■■■ As an initial matter, "there can be no actionable negligence unless there is a legal duty, violation of the duty, and a consequent injury." *Gray v. INOVA Health Care Servs.*, 257 Va. 597, 514 S.E.2d 355, 356 (1999) (citation omitted) (internal quotation marks omitted). Plaintiffs maintain that Defendant "breached its duty to exercise reasonable care and acted negligent and carelessly in, among others, the selection of their sponsors, and in failing to train their employees and/or agents in Kuwaiti immigration laws." (Second Am. Compl. I 76.) Plaintiffs argue that, in violation of Kuwaiti law, Defendant was negligent in failing to transfer sponsorship before the termination of the Al Shora contract in December 2012. (*Id.* I 33.)

■■■ To the extent Plaintiffs' negligence theory rests on negligent hiring of Al Shora, this Court previously held that the Defense Base Act bars such a theory of liability. (July 8 Mem. Op. at 34.) Assuming, without deciding, that Defendant had a legal duty under Kuwaiti law to maintain local sponsorship and negligently failed to do so, Plaintiffs' claim fails because they have not alleged that their emotional disturbance caused physical injury. First, it is not clear that the physical injury is a manifestation of their emotional disturbance. Plaintiffs argue that "[t]heir physical injuries caused by their emotional distress ranged from pneumonia to fevers to various infections, including eye and ear infections." (Second Am. Compl. 79.) But elsewhere in the Second Amended Complaint, Plaintiffs attribute their sickness to the "horrid and stressful living conditions," rather than their emotional distress. (*Id.* ¶ 21) ("Given the horrid and stressful living conditions, Plaintiffs got very sick. Their sickness ranged from pneumonia to fevers to various infections, including eye and ear infections.") Even generously construing Plaintiffs' inconsistencies in their favor, causation still cannot be satisfied. By their own admission, Plaintiffs were unaware of their change in legal status until July 2013. (*Id.* ¶ 28.) Yet they allege they were confined to the base from early 2013. (*Id.* ¶ 16.) Any injuries they suffered from such confinement could not have been caused by emotional distress from Defendant's negligence in failing to find a new sponsor because Plaintiffs were completely unaware that they were sponsorless.

Plaintiffs have not alleged that their emotional distress caused their physical

injuries, which defeats their claim for negligent infliction of emotional distress. Therefore, Defendant's motion as to Count 3 will be granted.

### Count 4—Fraud

 "Under Virginia law, a claim of fraud requires six elements: '(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.'" *Lamberty v. Premier Millwork & Lumber Co., Inc.,* 329 F.Supp.2d 737, 743 (E.D.Va.2004) (quoting *Prospect Dev. Co. v. Bershader,* 258 Va. 75, 515 S.E.2d 291, 297 (1999)). Concealment of a material fact may support a fraud claim under Virginia law only if a party makes a "knowing and deliberate decision not to disclose a material fact," and the concealing party "knows that the other party is acting upon the assumption that the fact does not exist." *Girgis v. Salient Solutions, Inc.,* No. 1:11–CV–1287, 2012 WL 2792157, at *15 (E.D.Va. July 9, 2012).

 "In alleging fraud ... a party must state with particularity the circumstances constituting fraud or mistake, but intent and other conditions of a person's mind may be alleged generally." Fed. R.Civ.P. 9(b). At minimum, a plaintiff alleging fraud must describe "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 379 (4th Cir.2008) (citation omitted). "When the fraud alleged is based on an omission of material fact, Rule 9(b) requires that plaintiffs plead the type of facts omitted, the place in which the omission should have appeared, and the way in which the omitted facts made the defendant's affirmative representations misleading." *Morris v. Wachovia Sec., Inc.,* 277

F.Supp.2d 622, 645 (E.D.Va.2003). "In assessing whether a plaintiff has satisfied the requirements of Rule 9(b), courts must be mindful that the principle purpose behind the rule is to prevent strike suits. Thus, while mere incantation of the word 'fraud' is clearly insufficient, Rule 9(b) does not require a dissertation." *Id.* (citations omitted).

 Here, Plaintiffs allege Defendant purposefully concealed the lack of a sponsorship agreement with a local company as required under Kuwaiti law. Plaintiffs alleged that "GLS did not obtain the transfer of Plaintiffs' Kuwaiti sponsorship for Al Shora as required prior to the termination of the Al Shora contract on December 5, 2012." (Second Am. Compl. ¶ 33.) Plaintiffs specifically allege:

- At the time GLS had Plaintiffs sign the 2013 Contract, GLS's sponsorship contract with Al Shora had expired, but Plaintiffs [sic] sponsorship had not been transferred from Al Shora to another Kuwaiti sponsor.

[...]

- At the time GLS had Plaintiffs sign the 2013 Contract, GLS's employment of Plaintiffs in Kuwait was unlawful since GLS was unable to obtain Al Shora's agreement to continue sponsoring Plaintiffs for GLS or to transfer their sponsorship to another Kuwaiti entity.

- GLS concealed the lack of Kuwaiti sponsorship for Plaintiffs' employment from Plaintiffs at all times prior to Plaintiffs' execution of the 2013 Contract.

- At the time Plaintiffs were induced to enter into the 2013 Contract they were ignorant of the fact that GLS did not have [sic] required Kuwaiti sponsorship lined up for Plaintiffs.

- The lack of Kuwaiti sponsorship was material and Plaintiffs would not have signed or entered into the 2013 Contract had they been aware that GLS did not have a sponsorship agreement with a Kuwaiti entity that would cover Plaintiffs' employment under the 2013 Contract.

- GLS knew that Plaintiffs assumed their employment pursuant to the 2013 Contracts would be lawful under Kuwaiti law, including that they would be properly sponsored by a Kuwaiti entity.

[...]

- Subsequent to when Plaintiffs and GLS entered into the 2013 Contract, Al Shora turned over the names of GLS's employees (including Plaintiffs) to Kuwaiti immigration authorities, declared them absent from work, and in violation of their working visas. Consequently Plaintiffs and other Linguists' work visas were cancelled, and they were placed on Kuwaiti's [sic] "blacklist" for arrest and/or deportation.

[...]

- In short GLS's actions and legal dispute with Al Shora made Plaintiffs and other Linguists fugitives in a foreign country. GLS used Plaintiffs—its own employees—as pawns in its monetary dispute with Al Shora.

(*Id.* ¶ 28(a)—28(h), (k)-(m).) Plaintiffs have thus alleged that Defendant intentionally and knowingly failed to disclose a material fact to induce Plaintiffs to sign employment contracts they would have otherwise not signed. This was done, according to Plaintiffs, so that Defendant could continue profiting from Plaintiffs'

translation services. The Court finds these allegations sufficient to state a claim for fraud under both state substantive law and federal pleading standards. *See Lamberty*, 329 F.Supp.2d at 744.

Defendant renews its previous arguments in support of dismissal of the fraud claim. (Def.'s Mot. to Dismiss Mem. at 20.) As before, the Court finds those arguments unpersuasive. (*See* July 8 Mem. Op. at 44.) Accordingly, Defendant's motion to dismiss the fraud claim is denied.

**Count Five—Rescission**

In this count, Plaintiffs seek rescission of the employment contracts on grounds of "fraud, overreaching, undue influence, and/or unconscionability."[5] (Second Am. Compl. ¶ 104); *see Gregory v. FedEx Ground Package System, Inc.*, No. 2:10cv630, 2012 WL 2396873, at *5 (E.D.Va. May 9, 2012), *report and recommendation adopted*, 2012 WL 2396861 (E.D.Va. June 25, 2012) (considering plaintiffs' claim for rescission of an employment contract on grounds that it is void against public policy and an unconscionable adhesion contract). A party seeking rescission of a contract has a high burden, as rescission is "a remedy which calls for the highest and most drastic power of a court of chancery-to annul and set at naught the solemn contracts of parties." *Schmidt v. Household Finance Corp., II,* 276 Va. 108, 661 S.E.2d 834, 837 (2008) (citation omitted) (internal quotation marks omitted). "There must first be a sufficient averment of facts showing the plaintiff entitled in equity to the relief which he seeks, and satisfactory proof of these facts, to justify the interposition of the court." *Id.* In addition to sufficient factual allegations, the plaintiff must show that the court can substantially restore the parties to the po-

---

5. The Court assumes Plaintiffs have pled this in the alternative to their breach of contract claim. *See* Fed.R.Civ.P. 8(e) ("Pleadings must be construed so as to do justice.").

sition they occupied before they entered into the contract. *Id.* at 837; *see also McLeskey v. Ocean Park Investors, Ltd.,* 242 Va. 51, 405 S.E.2d 846, 847 (1991) ("If rescission is to be granted, the contract is terminated for all purposes, and the parties are restored to the *status quo ante.*").

▌ As noted earlier, the contracts at issue here are not adhesion contracts, as Plaintiffs could terminate their contracts for any reason and return to the United States to seek other employment. However, Plaintiffs have made out a colorable fraud claim in the procurement of the employment contracts. Therefore, the question remains whether this Court could substantially unwind the transaction through the remedy of rescission. Defendant correctly notes that rescission requires both parties to "disgorge the fruits of the bargain." (Def.'s Mot. to Dismiss Mem. at 15.) This means Defendant would be required to disgorge Plaintiffs' services (or the value thereof) and Plaintiffs would be required to disgorge their earnings. Plaintiffs have not addressed their obligations if the contract was rescinded. Though obviously impossible to restore these parties to their pre-employment contract position, Virginia courts recognize that literal restoration is not required. "[B]ut where, on account of the act of the adverse party, complete restitution cannot be had, rescission will not be denied, and the court will, so far as practicable, require the party profiting by the fraud to surrender the benefit he has received in the transaction." *Millboro Lumber Co. v. Augusta Wood Products Corp.,* 140 Va. 409, 125 S.E. 306, 310 (1924). In *Millboro,* the Virginia Supreme Court upheld an award of damages to a plaintiff seeking rescission. Applying *Millboro* in considering a motion to dismiss, another court in this district found that restoring parties to the positions they enjoyed prior to entering into an employment contract could be accomplished through offsetting damages. *Gregory,* 2012 WL 2396873, at *6; *see Saunders v. General Services Corp.,* 659 F.Supp. 1042, 1057 (E.D.Va.1987) (holding restoration could be accomplished by offsetting amount plaintiff received in consideration for the contract from any damages award it received). In allowing the claim to go forward, the *Gregory* court found restoration (and thus rescission) was feasible. But it reserved deciding whether rescission was in fact the best remedy until after all the facts were in evidence. *Gregory,* 2012 WL 2396873, at *7 ("Although rescission may not be an appropriate remedy upon further examination of the facts, it appears from the allegations [in the complaint] that the Court could achieve equitable restoration by offsetting the benefits Plaintiffs gained under the [employment contract] against any amounts owed to them as a consequence of being misclassified as independent contractors.")

Here, the Second Amended Complaint provides no guidance as to whether determining the value of Plaintiffs' interpretation services to the Defendant would be feasible. And it is not for this Court to speculate as to whether such valuation is, in fact, practicable. Since Plaintiffs have not moved this claim from the conceivable to the plausible, Defendant's motion to dismiss as to this claim will be granted.

### Count Six—Promissory Fraud

▌ " 'Because fraud must involve a misrepresentation of a present or a preexisting fact, fraud ordinarily cannot be predicated on unfulfilled promises or statements regarding future events.' " *Girgis,* 2012 WL 2792157, at *12 (quoting *Supervalu, Inc. v. Johnson,* 276 Va. 356, 666 S.E.2d 335, 342 (2008)). But "if a defendant makes a promise that, when made, he has no intention of performing, that promise is considered a misrepresentation of

present fact and may form the basis for a claim of actual fraud." *Supervalu, Inc.,* 666 S.E.2d at 342. To satisfy the pleading standard for fraud under such a theory, a plaintiff must clearly allege a contemporaneous intent not to perform at the time a fraudulent statement is made. *See Station # 2, LLC v. Lynch,* 280 Va. 166, 695 S.E.2d 537, 540 (2010).

 In their Second Amended Complaint, Plaintiffs raise one new allegation. Plaintiffs argue that Defendant "knew that Plaintiffs would not enter the 2013 Contract if [the lack of sponsorship] was disclosed." (Second Am. Compl. ¶ 110.) This new allegation does nothing to change this Court's prior analysis of the promissory fraud claim. (July 8 Mem. Op. 45–46.) Therefore, Count 6 will be dismissed.

### Count Seven—Breach of Contract

 In Virginia, the elements of a breach of contract action are "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Signature Flight Support Corp. v. Landow Aviation Ltd. Partnership,* No. 1:08cv955, 2009 WL 111603, *8 (E.D.Va. Jan. 14, 2009) (quoting *Filak v. George,* 267 Va. 612, 594 S.E.2d 610, 614 (2004)). It is undisputed that a contract exists between the parties in this case, and, for purposes of this motion, Defendant does not contest the issue of damages. Accordingly, the only point of contention is whether Plaintiffs have sufficiently alleged breach.

 Plaintiffs allege two breaches. First, Plaintiffs contend "GLS, in material breach of the 2013 Contract, failed to pay for Plaintiffs' transport back home. Instead Plaintiffs paid a minimum of $1,000.00 each, out of their own pockets, to pay for their transport back to the United States." (Second Am. Compl. ¶ 119) Section 16(c) of the employment contract states "Transportation Expenses—The Employer shall provide return transportation from the Employee's work location to IRDO [Individual Replacement Deployment Operations] for outprocessing if this Agreement is terminated." (Phillips Decl., Ex. 1 at 8.) The IRDO is in Indiana. (Def.'s Mot. to Dismiss Mem. at 18.) Plaintiffs have not alleged any facts tending to show Defendant failed to pay for transportation to the IRDO. Furthermore, under the contract Defendant's only obligation is to provide transportation to the IRDO. After that has been met, any additional travel inside the United States is Plaintiffs' responsibility. Therefore, Plaintiffs have failed to state a claim for breach of contract for failing to provide transportation. To the extent that Plaintiffs are reasserting Defendant has breached the contract because of delay in providing return transportation, this Court considered and rejected that theory of breach in the July 8 Memorandum Opinion. (July 8 Mem. Op. at 46–47.)

 Second, Plaintiffs allege Defendant failed to pay Plaintiffs per diem rates and "other benefits promised to them." (Second Am. Compl. ¶ 120.) Section 3(f) of the contracts states that for "TDY Travel" (temporary duty travel off-base) Plaintiffs *"may* be entitled to approved per diem rates." (Phillips Decl., Ex. 1 at 3) (emphasis added). Plaintiffs have not alleged that they made any such TDY Travel. Additionally, "may" indicates that per diem rate for such travel was not an automatic entitlement; thus, it is not clear that they would necessarily receive a per diem had they done any TDY Travel. It is undisputed that the Engility contracts provided per diem benefits. (Def.'s Mot. to Dismiss. Mem. at 18.) However, those contracts are not at issue here.

■ As to "other benefits promised to them," Plaintiffs have failed to allege in any detail the benefits they are supposedly owed. In their Opposition to Defendant's Motion to Dismiss, Plaintiffs assert that they have stated a claim for paid time off benefits ("PTO benefits") that may be owed to them. (Pls.' Opp'n to Def.'s Mot. to Dismiss at 19.) Section 4 of Attachment A of the contract provides that Plaintiffs "shall accrue on a biweekly basis, 5 days of PTO for 12 months of service based on a twelve (12) hour work day and a six (6) day work week." (Phillips Decl., Ex. 1 at 11.) But neither the Second Amended Complaint nor Plaintiffs' Opposition detail any factual allegations to support their claim that they did not receive PTO benefits to which they were entitled.[6]

Accordingly, Plaintiffs have failed to allege a claim for breach of contract for failure to pay per diem and other benefits. As both of Plaintiffs' grounds for breach of contract are insufficient as a matter of law, this Court will dismiss Count 7.

### Count Eight—Violation of Kuwaiti Labor Law

Lastly, Plaintiffs allege violations of Kuwaiti labor law regarding overtime, holiday, and vacation pay. (Second Am. Compl. ¶¶ 125–28.) Plaintiffs have not alleged any additional facts that would change this Court's analysis as set forth in the July 8 Memorandum Opinion. Accordingly, this claim fails because, as noted above, the parties have validly contracted to refer to a different body of law—Virginia—to govern disputes concerning the terms and conditions of Plaintiffs' employment with Defendant. Therefore, the Court will grant Defendant's motion as to Count 8.

### C. GLS's Motion to Strike Jury Demand

Defendant has moved to strike Plaintiffs' jury demand, arguing that Plaintiffs have knowingly and intelligently waived their right to jury trial in signing the employment contracts. Federal Rule of Civil Procedure 39(a)(2) states that when a trial by jury is demanded, the case must be docketed as a jury action and a trial on all issues so demanded must be by jury unless "the court, on motion or on its own, finds that on some or all of those issues there is no federal right to jury trial." Fed.R.Civ.P. 39(a)(2); *see Dunkin' Donuts Franchised Rests. LLC v. Manassas Donut Inc.*, 2008 WL 110474, at *2 (E.D.Va. Jan. 8, 2008).

■ Though the Seventh Amendment of the United States Constitution guarantees the right to a jury trial in civil cases, courts in this circuit have long recognized that parties to a contract may waive this right by prior written agreement. *See Leasing Serv. Corp. v. Crane*, 804 F.2d 828, 832 (4th Cir.1986). The party seeking enforcement of the waiver must show that consent to the waiver was both voluntary and informed. *Leasing*

---

**6.** Defendant asserts that Plaintiffs cannot use their Opposition to re-plead allegations in the Second Amended Complaint. (Def.'s Resp. to Pls.' Opp'n to Mot. to Dismiss [Dkt. 127] at 14–15. In considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), courts may consider "documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Bala v. Commonwealth of Virginia Dept. of Conservation and*

*Recreation*, 532 Fed.Appx. 332, 334 (4th Cir. 2013); *see Caner v. Autry*, 16 F.Supp.3d 689, 699, 2014 WL 2002835, at *5 (W.D.Va.2014) ("If I were to consider [Defendant's] Motion under Rule 12(b)(6), I would consider the material submitted with Plaintiff's response to the motion, as it is integral or incorporated into the Amended Complaint."). Therefore, it is within this Court's discretion to consider arguments advanced in Plaintiffs' Opposition, as "they are integral to the complaint."

*Serv. Corp.*, 804 F.2d at 833. " 'Because the right to a jury trial is fundamental, [the] court should 'indulge every reasonable presumption against waiver.' ' " *Taylor v. Republic Servs.*, No. 1:12cv00523–GBL–IDD, 2013 WL 8808090, at *2 (E.D.Va. Apr. 16, 2013) (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed. 1177 (1937)). In considering whether the waiver was voluntary, a court will consider "(1) the parties' negotiations concerning the waiver provision; (2) the conspicuousness of the provision in the contract; (3) the relative bargaining power of the parties; and (4) whether the waiving party's counsel had an opportunity to review the agreement." *Dunkin' Donuts,* 2008 WL 110474, at *2.

 Applying these factors here, Plaintiffs have voluntarily and knowingly waived their right to jury trial.[7] First, Plaintiffs allege that they did not have an opportunity to negotiate the terms of the agreement. While the fact that the parties here did not negotiate over the provision is relevant, it is certainly not dispositive. *See Bryant Elec. Co., Inc. v. City of Fredericksburg,* 762 F.2d 1192, 1197 (4th Cir. 1985) (upholding a forum selection clause in a contract entered into after competitive bidding process,\where there was very little negotiation regarding its terms); *Torres v. SOH Distribution Co.,* 2010 WL 1959248, at *3 (stating, in a case brought by plaintiff-employee against defendant-employer, that "[a] mere lack of actual bargaining will not render a forum selection clause unenforceable.").[8]

Second, the placement of the jury waiver provision is conspicuous. The paragraph is written in the same typeface and size as other provisions in the contract. It appears on page eight of twelve under the heading "Governing Law." The provision is written in unambiguous and clear language. Though the provision is not bolded or italicized, the contract is short and is printed in easy-to-read typeface. *See Leasing Serv. Corp.,* 804 F.2d at 833 (upholding jury waiver clause that was in a two-page standardized fine print contract provided by the plaintiff, where the waiver was in the ninetieth line of print in the middle of a thirty-eight line paragraph). Plaintiffs initialed every page of the employment contracts, including the page with the jury trial waiver on it, acknowledging their review and acceptance of the terms of the contract.

Third, the relative bargaining power of the parties weighs in favor of upholding the clause. Plaintiffs argue that "the very nature of the relationship of the Plaintiffs and GLS, as individual employees and large corporate employer, dictates that Plaintiffs were in a substantially weaker bargaining position than GLS." (Pls.' Opp'n to Def.'s Mot. to Strike [Dkt. 123] at 9.) But courts in this circuit have routinely upheld jury waiver and arbitration provisions in employment contracts between individual plaintiffs and corporate defendants. *Green v. Zachry Indus., Inc.,* 36 F.Supp.3d 669, 676–77, No. 7:11CV00405, 2014 WL 1232413, at *6 (W.D.Va. Mar. 25, 2014); *Gallo v. U.S. Investigation Servs.,* 2006 WL 1647194 at *2 (E.D.Va. June 8, 2006); *see also Dunkin' Donuts,* 2008 WL 110474, at *2 ("Courts have found waivers

---

7. The relevant provision states "[b]oth parties hereby agree and consent to waive the right to a trial by jury." (Phillips Decl., Ex. 1 at 8.)

8. The letter transmitted with the Engility contract notified Plaintiffs that they had an opportunity to ask questions before signing the contracts. (Def.'s Mot. to Dismiss Am. Compl. [Dkt. 80], Lucas Decl., Ex. 1 at 4) ("If you would like clarification of any required disclosures or obligations please contact the undersigned before signing this offer.").

knowing and voluntary even in the context of franchise agreements, where contractual terms are often non-negotiable and where there may be a slight disparity of bargaining power between the parties.").

In *Taylor v. Republic Services,* Judge Lee upheld a jury waiver provision in an employment agreement. No. 1:12–cv00523–GBL–IDD, 2013 WL 8808090, at *3 (E.D.Va. Apr. 16, 2013). Rejecting plaintiff's claim that the contract was a product of unequal bargaining power, Judge Lee stated the contract "is not one-sided, as it applies to both employer and employee alike." *Id.* Furthermore, the court continued, "there is no evidence before the Court that Plaintiff did not possess sufficient education and experience to enter into the Agreement, nor has Plaintiff supplied any evidence to support a claim of unconscionability." *Id.* Here, the jury waiver provision applies to both parties. Beyond a cursory statement that Plaintiffs "had limited business/professional experience with respect to contract negotiations and certainly had no knowledge of the legal ramifications of the clauses," Plaintiffs have offered no evidence to support this claim. *See Bryant,* 762 F.2d at 1196–97 (upholding a forum-selection clause where there was no evidence to "suggest that [the plaintiff] is an unsophisticated entity lacking sufficient commercial expertise to be able to decide whether to enter into a given contract.").

Finally, Plaintiffs state that they were "not permitted" to seek legal counsel prior to signing the contracts "as they were told by GLS that not signing would result in arrest." (Pls.' Opp'n to Def.'s Mot. to Strike at 9–10.) Defendant does dispute that Plaintiffs were not afforded the opportunity to consult with legal counsel prior to signing the agreement. Other courts that considered this factor have concluded that the lack of counsel was harmless error because either the party challenging the

waiver was sophisticated or the waiver contained language that advised legal consultation. *Dunkin' Donuts,* 2008 WL 110474, at *3 (stating that independent legal review was unnecessary because one of the challengers was an attorney and the other a sophisticated franchisee); *Gallo,* 2006 WL 1647194, at *2 (stating waiver had a conspicuous warning admonishing plaintiff to consult with attorney prior to signing).

This case presents different facts. The jury trial waiver does not contain any language discussing independent legal review and Plaintiffs did not have an opportunity to have an attorney review the agreement. Notwithstanding these facts, the lack of legal counsel does not merit striking the jury waiver provision. Plaintiffs have not put forward any concrete evidence that they lacked sufficient expertise to understand the provision, and Defendant was under no duty to make sure that Plaintiffs fully informed themselves of the jury trial waiver. *Sydnor v. Conseco Fin. Serv. Corp.,* 252 F.3d 302, 306 (4th Cir.2001). Furthermore, upon signing the employment contracts Plaintiffs did not lose a jury trial right they had previously enjoyed. The Engility contracts required any disputes to be resolved by binding arbitration. (Def.'s Mot. to Dismiss Am. Compl. [Dkt. 80], Lucas Decl., Ex. 1 at 9.) Therefore, Plaintiffs' lack of legal counsel in signing the agreements is not enough to defeat the jury trial waiver.

■ Considering all four factors, Plaintiffs knowingly and voluntarily agreed to the jury trial waiver. Plaintiffs argue the jury trial waiver is unenforceable because of fraud, duress, or coercion. This argument fails. A party's contractual jury trial waiver is generally enforced unless a party alleges that its agreement to waive its jury trial right "was *itself* induced by fraud." *Terry Phillips Sales, Inc. v. SunTrust Bank,* No. 3:13–CV–468, 2014 WL 670838,

at *7 (E.D.Va. Feb. 20, 2014) (emphasis added); *Silver v. JTH Tax, Inc.,* No. Civ.A. 2:05CV126, 2005 WL 1668060, at *7 (E.D.Va. June 21, 2005) ("[A]lthough the plaintiffs have made allegations of fraud in the inducement with respect to the Agreement itself, they have not singled out the jury trial waiver."). Plaintiffs have failed to allege any fraud related specifically to the inclusion of the jury trial waiver. Rather, their allegations of fraud and duress are directed at the contract as a whole. (*See* Pls.' Opp'n to Def.'s Mot. to Strike at 9–10.) Therefore, because the jury trial waiver itself was not the result of fraud, duress, or coercion, it is enforceable.

■ The jury trial waiver applies to all causes of action in this case. "Jury trial waivers in a contract are to be construed broadly to encompass both contract claims and related tort claims where the causes of action would not exist were it not for the relationship between [the parties], as well as counterclaims whether or not arising from the contract at issue." *Terry Phillips Sales,* 2014 WL 670838, at *7 (citation omitted) (internal quotation marks omitted). Here, the tort claims would not exist but for the contractual employer-employee relationship between Defendant and Plaintiffs. Therefore, the waiver of jury trial applies to these claims because they are an outgrowth of the contractual relationship.

### IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss as to Counts 2, 3, 5, 6, 7, 8 and will deny Defendant's Motion to Dismiss as to Counts 1 and 4. The Court will grant Defendant's Motion to Strike Plaintiffs' Jury Demand. An appropriate Order will issue.